Santiago ARAMBURU, Plaintiff,

v.

The BOEING COMPANY d/b/a Boeing Commercial Airplane Group, Wichita Division Boeing Corporation, and Larry Whitesell, Defendants.

No. 93–4064–SAC.

United States District Court, D. Kansas.

March 14, 1995.

Harold S. Youngentob, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for plaintiff.

Gloria G. Flentje, J. Steven Massoni, Foulston & Siefkin, Wichita, KS, for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

On March 22, 1993, the plaintiff, Santiago Aramburu, commenced this action against his former employer, The Boeing Company (Boeing). Aramburu's amended complaint seeks to recover damages and secure equitable relief to redress the deprivation of rights secured by the Civil Rights Act of 1991, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, Title I of the American with Disabilities Act of 1990 (ADA), and the Kansas Act Against Discrimination. The plaintiff claims that the defendants have discriminated against him on the basis of his Mexican American ancestry, as well as his work-related disability of carpal tunnel syndrome. Aramburu claims to have suffered discrimination at the hands of Larry Whitesell, his supervisor. The plaintiff's discrimination claims are based upon both disparate treatment and disparate impact theories. Boeing denies the plaintiff's allegations, arguing that the plaintiff was terminated based upon his failure to maintain acceptable attendance.

On December 28, 1993, this court entered a memorandum and order dismissing the plaintiff's ADA claim and his protected speech claims under the First and Fourteenth Amendments of the United States Constitution. *See Aramburu v. The Boeing Co.*, No. 93–4064–SAC, 1993 WL 544567, 1993 U.S.Dist. LEXIS 18620 (D.Kan. Dec. 29, 1993).

On September 22, 1994, the magistrate judge entered two separate memorandum and orders. *See* (Dk. 87 and 88). Each order addressed certain issues presented by Aramburu's motion to compel discovery (Dk. 39). While certain portions of the plaintiff's requests for discovery were denied, in large part, those orders were generally favorable to the plaintiff. The plaintiff did not seek review of those orders.

On October 6, 1994, pursuant to Fed. R.Civ.P. 72(a) and D.Kan.Rule 604, Boeing filed objections to the September 22, 1994, memorandum and orders entered by the magistrate judge. Boeing advances these objections to those orders: (1) The magistrate judge committed error by failing to recognize the self-critical analysis privilege; and (2) The magistrate judge committed error by allowing voluminous discovery of irrelevant material. Specifically, Boeing contends that permitting "Plaintiff's counsel to fish through approximately 1,700 personnel files for some evidence to support his client's discrimination claims is unwarranted, and will make this lawsuit wholly unwieldy." [1]

Aramburu responds, arguing that the magistrate judge's decisions were correctly decided. Aramburu contends that "the defendants have simply not negotiated in good faith to resolve discovery disputes." The plaintiff contends that in light of the defendants' attempts to "stonewall" the discovery process, and in the absence of convincing evidence to support the defendants' arguments against discovery, the magistrate judge's rulings correctly reflect the broad scope of discovery permitted by the Federal Rules of Civil Procedure.

### Standard of Review

As to nondispositive pretrial matters, the district court reviews the magistrate judge's order under a clearly erroneous or contrary to the law standard. 28 U.S.C. § 636(b)(1)(A); *Continental Bank, N.A. v. Caton,* 136 F.R.D. 691, 693 (D.Kan.1991).

**1.** In this appeal, Boeing has abandoned several of the other arguments it advanced before the

### Discovery Under the Federal Rules of Civil Procedure

Fed.R.Civ.P. 26(b) provides in pertinent part:

**Discovery Scope and Limits.** Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

(1) *In General.* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

(2) *Limitations* .... The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. The court may act upon its own initiative after reasonable notice or pursuant to a motion under subdivision (c).

magistrate judge.

The "Notes of Advisory Committee Rules" concerning the 1946 Amendment to 26(b) state:

> The amendments to subdivision (b) make clear the broad scope of examination and that it may cover not only evidence for use at trial but also inquiry into matters themselves inadmissible as evidence but which will lead to the discovery of such evidence. The purpose of discovery is to allow a broad search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of his case.

In *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978), the Supreme Court stated:

> The key phrase in this definition—"relevant to the subject matter involved in the pending action"—has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case. *See Hickman v. Taylor*, 329 U.S. 495, 501, 67 S.Ct. 385, 388, 91 L.Ed. 451 (1947). Consistently with the notice-pleading system established by the Rules, discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. *Id.*, at 500–501, 67 S.Ct. [at] 388–389, 91 L.Ed. 451. Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits. (footnote omitted).

*Id.* at 351, 98 S.Ct. at 2389.

The Tenth Circuit has held that "the trial court [has] broad discretion as to the control of discovery, ... and rulings will not set aside short of an abuse of discretion." *Marsee v. U.S. Tobacco Co.*, 866 F.2d 319, 326 (10th Cir.1989) (quoting *Shaklee Corp. v. Gunnell*, 748 F.2d 548, 550 (10th Cir.1984) (citations omitted)). "In particular, rulings on relevancy of material sought for discovery are within the trial court's discretion." *Marsee*, 866 F.2d at 326.

■ The party opposing the discovery has the burden of proving its lack of relevance. *Koch v. Koch Industries, Inc.*, No. 85–1636–C, 1992 WL 223816, 1992 U.S.Dist. LEXIS 14094 (D.Kan. Aug. 24, 1992) (citing *Flora v. Hamilton*, 81 F.R.D. 576, 578 (M.D.N.C. 1978)).

### Self-Critical Analysis Privilege

Boeing contends that the magistrate judge committed error by failing to recognize the self-critical analysis privilege. Boeing contends that forcing it to disclose portions of its affirmative action plans and related documents reflecting its subjective analysis of its own performance in meeting its objectively established affirmative action goals will have a chilling effect on all employers' full compliance with equal employment opportunity laws. Boeing contends that Magistrate Judge Rushfelt's opinion in *Hoffman v. United Telecommunications*, 117 F.R.D. 440, 442 (D.Kan.1987) (Magistrate Judge Rushfelt upholds employer's invocation of the self-critical analysis privilege), correctly states the law of the District of Kansas. Boeing contends that, contrary to the magistrate judge's analysis, the self-critical analysis privilege is well recognized among the lower courts and that this court should recognize the privilege for sound policy reasons.

Aramburu responds, arguing that the magistrate judge correctly refused to recognize the privilege of self-critical analysis. Aramburu contends that the magistrate judge's memorandum and order correctly states the law and should be affirmed for the reasons articulated in that opinion.

■ Under Fed.R.Civ.P. 26(b)(1), parties may obtain discovery regarding any matter which is not privileged that is relevant to the action or appears reasonably calculated to lead to the discovery of admissible evidence. The Federal Rules of Evidence acknowledge the authority of the federal courts to continue the evolutionary development of new privileges "in light of reason and experience." Fed.R.Evid. 501;[2]   *Trammel v. United*

---

2. The federal common law of privileges governs this action. *See Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir.1991) ("When considering a feder-

al claim, federal courts apply federal common law, rather than state law, to determine the existence and scope of a privilege."); *Everitt v. Brez-*

*States,* 445 U.S. 40, 47, 100 S.Ct. 906, 911, 63 L.Ed.2d 186 (1980).

■ The Supreme Court has recognized that the existence of privileges "contravene the fundamental principle that 'the public . . . has a right to every man's evidence.'" *Trammel,* 445 U.S. at 50, 100 S.Ct. at 912 (quoting *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950)). As such, privileges are "not lightly created nor expansively construed, for they are in derogation of the search for the truth." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974); *see Univ. of Pennsylvania v. EEOC,* 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990)[3] ("[A]lthough Rule 501 manifests a congressional desire 'not to freeze the law of privilege' but rather to provide the courts with flexibility to develop rules of privilege on a case-by-case basis, [*Trammel*], at 47 [100 S.Ct. at 911] we are disinclined to exercise that authority expansively."). The Supreme Court has also indicated that it is "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." *Univ. of Pennsylvania,* 493 U.S. at 189, 110 S.Ct. at 582. "The balancing of conflicting interests of this type is particularly a legislative function." *Id.*

"[I]n resolving the tensions between the opposed needs of disclosure of confidentiality we are reminded that the discovery rules are to be accorded broad and liberal treatment, particularly where proof of intent is required." *Hardy v. New York News, Inc.,* 114 F.R.D. 633, 640 (S.D.N.Y.1987) (quoting *Gray v. Board of Higher Educ., City of New York,* 692 F.2d 901, 904 (2d Cir.1982) (citing

*Herbert v. Lando,* 441 U.S. 153, 170–175, 99 S.Ct. 1635, 1645–48, 60 L.Ed.2d 115 (1979)).

■ Generally, the privilege for self-critical analysis "is based upon the concern that disclosure of documents reflecting candid self-examination will deter or suppress socially useful investigations and evaluations or compliance with the law or with professional standards." *Hardy,* 114 F.R.D. at 640.

*Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249, 251 (D.D.C.1970), *aff'd without opinion,* 479 F.2d 920 (D.C.Cir.1973), is commonly referred to as the seminal case recognizing the privilege for self-critical evaluation. In *Bredice,* the court held that the plaintiff in a medical malpractice case could not discover the minutes and reports created during the hospital's staff meetings. The purpose of those meetings and reports was solely to improve the available care and treatment of patients. The documents sought by the plaintiff contained self-critical analysis of the care and treatment of patients. In recognizing the privilege, the court commented:

> Confidentiality is essential to effective functioning of these staff meetings; and these meetings are essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care.

*Id.* at 250. The court concluded that the public interest in maintaining the confidentiality of hospital staff meetings outweighed the plaintiff's need for the documents she sought. Maintaining the confidentiality of the staff meetings preserved the unimpeded flow of ideas and advice, thereby fostering physicians' knowledge of up-to-date information and techniques. *Id.* at 251.[4]

---

*zel,* 750 F.Supp. 1063, 1066 (D.Colo.1990) ("Where federal law provides the governing substantive law in a lawsuit, the federal common law of privileges will govern."); *Wei v. Bodner,* 127 F.R.D. 91, 94 (D.N.J.1989) (where there are both federal and state law claims, federal privileges rather than state privileges apply to all claims), *aff'd,* 983 F.2d 1054 (3rd Cir.1992).

3. In *Univ. of Pennsylvania,* the Supreme Court held that a university being sued for discrimination under Title VII does not enjoy a special privilege, grounded in either the common law or

the First Amendment, against disclosure of peer review materials that are relevant to charges of racial or sexual discrimination in tenure decisions.

4. In *Bredice,* the court was particularly concerned that disclosure of documents containing self-critical analysis would undermine public health and safety. Physicians should obviously have access to information enhancing medical treatment. The need to protect self-critical analysis in the employment setting has generally not been considered to protect as vital a public inter-

Several lower courts have subsequently recognized the privilege for critical self-evaluation in different contexts. *See Reichhold Chemicals, Inc. v. Textron, Inc.,* 157 F.R.D. 522 (N.D.Fla.1994) (collecting cases recognizing self-critical analysis privilege in different areas besides medical care); *Hardy,* 114 F.R.D. at 640. However, "[t]he Supreme Court and the circuit courts have neither definitively denied the existence of such a privilege, nor accepted it and defined its scope. Rather, when confronted with a claim of the privilege, they have refused on narrow grounds to apply it to the facts before them." *Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423, 425 n. 1 (9th Cir.1992) (voluntary routine pre-accident safety reviews are not protected by a privilege of self-critical analysis); *see First Eastern Corp. v. Mainwaring,* 21 F.3d 465, 467 n. 1 (D.C.Cir.1994); *but see ASARCO, Inc., Tennessee Mines Div. v. N.L.R.B.,* 805 F.2d 194, 199–200 (6th Cir. 1986) (reversing ALJ order requiring ASARCO to disclose internal self-critical report; disclosure of the self-critical analysis would seriously affect the candor of future critiques and have a chilling effect that would defeat the critique's primary purpose); *Coates v. Johnson & Johnson,* 756 F.2d 524, 551 (7th Cir.1985) ("The prevailing view is that self-critical portions of affirmative action plans are privileged and not subject to discovery by plaintiffs.").

The privilege for critical self-analysis was first recognized in an employment discrimination case in *Banks v. Lockheed–Georgia Co.,* 53 F.R.D. 283 (N.D.Ga.1971). In *Banks,* the plaintiffs sought to discover an internal report created by Lockheed employees. The report included a "candid self-analysis and evaluation of the Company's actions in the area of equal employment opportunities." *Id.* at 284. The court denied the plaintiffs' motion for discovery, concluding that allowing "the plaintiffs access to the written opinions and conclusions of the members of Lockheed's own research team would discourage companies such as Lockheed from making investigations which are calculated to have a

positive effect on equalizing employment opportunities." *Id.* at 285.

Since *Banks* was decided, several courts have considered whether a privilege of critical self-evaluation exists in the employment context. While some courts have recognized the existence of the privilege of critical self-evaluation in an employment context, other courts have not embraced the privilege or have refused to extend the privilege to protect certain types of documents. *Martin v. Potomac Electric Power Co.,* No. 86–0603 (RCL), 1990 WL 158787, at *3–4 n. 1–2, 1990 U.S.Dist. LEXIS 11784, at *5–6 n. 1–2 (D.D.C. May 25, 1990) (collecting cases considering privilege). "Neither the United States Supreme Court nor the Tenth Circuit Court of Appeals has recognized a privilege for affirmative action plans, based upon self-critical analysis." *Zapata v. IBP, Inc.,* No. 93–2366–EEO, 1994 WL 649322, 1994 U.S.Dist. LEXIS 16285 (D.Kan. Nov. 10, 1994).

In *Steinle v. The Boeing Co.,* No. 90–1377–C, 1992 WL 53752, 1992 U.S.Dist. LEXIS 2708 (D.Kan. Feb. 4, 1992), Boeing asserted the self-critical analysis privilege in response to the plaintiff's request for discovery. In *Steinle,* the parties did not contest the issue of whether it was appropriate to recognize a self-evaluation privilege. Instead, the issue was whether the privilege was limited to materials prepared for mandatory governmental reports. This court affirmed Magistrate Judge Reid's ruling compelling the defendant to provide discovery, finding that "the defendant has not demonstrated a sufficiently compelling reason to prevent Steinle's discovery of the documents she seeks."

In the case at bar, Magistrate Judge Newman, recognizing a split of authority among the district courts as to whether the privilege applies in Title VII cases and whether it applies to affirmative action plans, conducted an exhaustive review of cases considering the issue. Based upon that review, Magistrate Judge Newman refused to recognize the privilege.

est. *See Martin v. Potomac Electric Power Co.,* No. 86–0603 (RCL), 1990 WL 158787, at *1–2, 1990 U.S.Dist LEXIS 11784, at *4 (D.D.C. May 25, 1990) (no similar strong policy consider-

ations which justify shielding documents from discovery in private employment discrimination suits).

First, based upon the Supreme Court's holding in *University of Pennsylvania*, the magistrate judge concluded that the peer review privilege recognized in *Bredice* does not have a historical, constitutional, or statutory foundation. Because *Banks* was premised on the holding and rationale of *Bredice*, the court declined to follow *Banks*. Second, the court rejected *Banks'* underlying assumption that access to affirmative action plans by litigants would discourage employers from making investigations which are calculated to have a positive effect on equalizing employment opportunities. Instead, the court "ascribe[d] to the proposition that employers are generally likely to comply with legal requirements and will prepare affirmative action plans and implement them regardless of whether, at a later time, they may be subject to disclosure."

Third, in light of the fact that Congress nor the EEOC has made provision for such a privilege in the thirty years since the Civil Rights Act of 1964 was passed, the magistrate judge concluded that it would be inappropriate for the court to recognize such a privilege. Fourth, the court concluded that because an "employer may use affirmative action plans to its benefit, the employee should likewise be entitled to discovery of the plan to determine whether there is evidence which the employee may use to establish the employee's claim," and in light of "the strong public policy in favor of private enforcement of the Civil Rights Act as a method of discouraging discrimination in employment," the scales tipped in favor of disclosure. Finally, based upon the fundamental principles set forth in *University of Pennsylvania* the court held that it was inappropriate to recognize the privilege of self-critical evaluation in Title VII cases.

In *Zapata*, Magistrate Judge Rushfelt specifically considered and adopted the position advanced by Magistrate Judge Newman's memorandum and order in *Aramburu*:

> This court considered the self-critical analysis privilege in *Hoffman v. United Telecommunications*, 117 F.R.D. 440 (D.Kan.1987). It found that the privilege should protect the self-critical portions of EEO–1 reports which the employer by law

filed with the government. *Id.* at 443. More recently in the District of Kansas, United States Magistrate Judge Ronald C. Newman declined to recognize the privilege. *See Aramburu v. Boeing*, No. 93–4064–SAC, unpublished op. at 10, 1994 WL 810248 (D.Kan. Sept. 21, 1994).

In *Aramburu* the defendant objected to producing its affirmative action plans. It contended they were protected by the self-critical analysis privilege. The court relied on *University of Pennsylvania v. EEOC*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571, (1989). The Supreme Court there refused to recognize such a privilege for peer-review materials. *Aramburu* noted, therefore, that "the [Supreme] Court expressed reluctance to recognize a privilege 'in an area where it appears that Congress has considered the relevant competing concerns but has not provided for the privilege itself.'" *Aramburu*, at 7 (quoting *University of Pennsylvania*, 493 U.S. at 189, 110 S.Ct. at 582).

Based on this language, Judge Newman declined to apply a self-critical analysis privilege to cases involving affirmative action plans where "Congress itself has not seen fit to create [a privilege] after almost 30 years of implementation of the Civil Rights Act of 1964." He also stressed that the EEOC, in its rule-making functions, had never provided for a privilege for affirmative action plans.

The well-reasoned and persuasive opinion of Judge Newman should apply to this case. The earlier decision in *Hoffman* preceded *University of Pennsylvania* and *Aramburu*. The court, accordingly, declines to recognize the privilege as to IBP's affirmative action plans and reports. The court sees no reason to further assume a privilege that has no "historical, constitutional or statutory grounding." *Aramburu*, at 8. Defendant shall produce all requested affirmative action plans or reports from January, 1985 to the present, as item 11 of the request for production requests. *Zapata*, 1994 WL 649322, at *5–*6, at *14–16.

Therefore, at present, the courts in this district do not embrace the self-critical analy-

sis privilege in Title VII. The court also notes that Judge Belot was recently unwilling to recognize a "self-policing" or "self-critical analysis" type of privilege in an excessive force action under 42 U.S.C. § 1983. *See Mason v. Stock,* No. 92–1539–MLB, 1994 WL 682912, 1994 U.S.Dist. LEXIS 12167 (D.Kan. Aug. 24, 1994).

██ This court, based upon the arguments and authorities relied upon by Magistrate Judge Newman, agrees that it is inappropriate to recognize the privilege of self-critical analysis in Title VII cases.

### Production of Affirmative Action Plans

Boeing contends that even if this court does not recognize the privilege of self-critical analysis, the magistrate judge nevertheless committed error by requiring it to produce its affirmative actions plans in that those plans do not contain information relevant to this lawsuit. Boeing contends that portions of those plans are "wholly irrelevant" in that the plans address the utilization of women and racial minorities (African–Americans, Asian Americans, and Native Americans) in its work force. Boeing also contends that the plaintiff should be limited to discovery of the plans relevant only to the department in which he was employed.

Aramburu responds, arguing that the magistrate judge correctly concluded that discovery of Boeing's affirmative action plan was appropriate.

The magistrate judge's September 22, 1994, memorandum and order states in pertinent part:

> The court finds that the requested documents appear reasonably calculated to lead to the discovery of admissible evidence and, thus are relevant for discovery purposes. Defendant has failed to come forward with any evidence to establish that the requested discovery is not relevant to the issues in dispute.

Memorandum and Order (Dk. 88), at 3.

In contrast to its objection to production of personnel files, Boeing does not argue that production of these materials will be burden-

some.[5] The only remaining issue is whether these materials sought by Aramburu are relevant. While it appears that some of the information Boeing is required to produce regarding its affirmative action plans may be of limited probative value, the court concludes that the magistrate judge's determination that the requested documents appear reasonably calculated to lead to the discovery of admissible evidence is not clearly erroneous.

### Production of 1,700 Personnel Files

Under the collective bargaining agreement governing the terms of Aramburu's employment with Boeing, as long an employee has available sick leave or vacation time and report such time, an employee should not be penalized. In addition, an employee who has used all of his accumulated sick leave can use available vacation in lieu of sick leave. Even if an employee has used all of his sick leave and vacation leave, no infraction would be assessed to the employee if the absence is classified as excused leave without pay. *See Jackson v. Boeing,* No. 90–1448–K, 1992 WL 42913, 1992 U.S.Dist. LEXIS 2866 (D.Kan. Feb. 10, 1992) (discussing Boeing's attendance policy under the collective bargaining agreement).

According to Aramburu's brief, he was terminated by Boeing because "the computer showed that he violated the company's attendance policies." Aramburu contends that Boeing's attendance policy is not "black and white" in that the supervisors who evaluate and categorize each employee's absence, enter the data into the computer. Because Boeing invests supervisors with the discretion to assess infractions, to excuse infractions and to initiate or refuse to initiate discipline, Aramburu contends that "[t]he actions of management in this regard can only be assessed by review of personnel records."

Boeing contends that the magistrate judge's order compelling discovery of the 1,700 personnel files is clearly erroneous. Boeing contends that the plaintiff's requests for this information is not reasonably calculated to lead to the discovery of admissible

---

**5.** These materials, like other documents produced during discovery in this case, would be subject to the protective order entered on June 28, 1993. *See* (Dk. 12).

evidence and that production of the files will be unduly burdensome.

Specifically, Boeing contends that "plaintiff's counsel intends to search through thousands upon thousands of pages of documents for incidents of attendance policy infractions that did not result in disciplinary action or termination." If the plaintiff is permitted to introduce such incidents, Boeing contends that it will be entitled to an opportunity to prove that there is a non-discriminatory explanation for the action taken. In that event, it will take weeks or months to try this case. Boeing also indicates that the files that the plaintiff seeks do not contain all of the information he seeks; instead, information relevant to attendance will be found in other files or from interviews of each of the supervisors who monitor attendance. Boeing's reply brief indicates that the types of records Aramburu is seeking are not regularly maintained company documents.

Boeing indicates that it has produced the work histories of the thirty employees who worked under Whitesell at the same time the plaintiff did, as well as those employees' complete personnel files, relevant personnel representative files, and shop files. Boeing has also produced records regarding the attendance of those persons under Whitesell's supervision, including Whitesell's attendance notebook. Boeing has also agreed to produce computerized attendance histories of person's under Whitesell's supervision. In addition, Boeing has produced a list of employees who failed to maintain acceptable attendance for 1988 through 1992. That list includes the E.E.O. codes and the gender of each employee.

Boeing, citing several cases, contends that an examination of how other supervisors have enforced Boeing's attendance policies is irrelevant to determining whether Aramburu was discriminated against by Whitesell.

Finally, Boeing argues that production of the 1,700 files is unduly burdensome. In support of this contention, Boeing has submitted the affidavit of Debra S. Hoyer, the manager of employee records for Boeing's Wichita employees, which indicates that it will take 240 hours full-time to pull 1,500 personnel files.

Aramburu responds, arguing that the magistrate judge's order was not clearly erroneous. Aramburu contends that the information he seeks is relevant to his claims or will lead to information that is relevant and that the defendants have not met their burden of establishing that the requested documents are irrelevant. Aramburu argues that it is well settled that personnel files and work records may be discovered in discrimination actions. Aramburu contends that Boeing's personnel files will contain, at least in part, attendance records, and that such records are necessary to evaluate the computer attendance records; "[t]he personnel records are the key to understanding whether the attendance policy is being applied fairly and equally by the defendants."

### Relevancy of the Material Sought

■ The plaintiff correctly argues that the courts, including the Tenth Circuit, have permitted discovery of personnel files and work records, even of other employees, in discrimination actions. See *Weahkee v. Norton*, 621 F.2d 1080, 1082–1083 (10th Cir.1980) (plaintiff entitled to discovery personnel files of employees who plaintiff claims were hired or promoted in discriminatory preference over him.); *Rich v. Martin Marietta Corporation*, 522 F.2d 333, 344–355 (10th Cir.1975) (plaintiffs entitled to discovery of information regarding plant-wide job and promotional policies); *Cf., Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir.1991) ("In Title VII litigation, in which plaintiffs are similarly required to demonstrate pretext, courts have customarily allowed a wide discovery of personnel files."). However, these general rules favoring discovery are tempered by the relevancy of the information sought and the burden imposed by permitting discovery.

As Boeing suggests, some "[c]ourts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir.1989). *See E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1320 (10th Cir.1992) ("Sometimes apparently irrational differences in treatment between different employees that cannot be explained on the basis of clearly

articulated company policies may be explained by the fact that the discipline was administered by different employees...." ) (citing *Jones* ) (footnote omitted).

Aramburu contends that the cases cited by Boeing are factually distinguishable from the case at bar. In pertinent part, Aramburu's brief states:

> [T]he defendants have chosen to ignore the facts and issues in this case. It is uncontroverted that the plaintiff in this case is challenging the policies of defendant Boeing that permit discrimination and adversely impact minorities. The policies allowing such discrimination are not an issue in any of the cases cited by the defendants. Further, the application of the policies, and their review by upper management, are not issues in the cases cited by the defendants. This case transcends the hostile work environment. It is a challenge to the defendants allowing (sic) discrimination to exist and in ignoring its own Affirmative Action Plan which was established to prevent and remedy such discriminatory conduct. Thus, the facts of this case and the claims asserted clearly support Judge Newman's statement finding "[t]he relevance of these files is obvious."

Aramburu's brief at p. 16–17.

As the court understand Aramburu's disparate impact claim, he contends that although Boeing's attendance policy appears to be facially neutral, the selective and discriminatory exercise of the discretion afforded Boeing managers allows those managers to manipulate attendance records in a manner discriminatory to Mexican–Americans. In short, the racial animus of Boeing's supervisors results in intentional discrimination adversely impacting Mexican American employees.

■ If the court has correctly summarized the plaintiff's allegations from both his brief and amended complaint, it does not appear that he is in reality asserting a disparate impact claim.[6] Discrimination may be proven under either a disparate treatment or disparate impact theory. *See MacDonald v. Eastern Wyoming Mental Health Center,*

941 F.2d 1115, 1119 (10th Cir.1991). Although a plaintiff may attempt to prove discrimination under either or both theories, and while some evidence may be relevant to both theories, each theory is premised upon distinctly different methods of proof.

■ "Disparate treatment occurs where 'the employer simply treats some people less favorably than others' because of their sex or other protected status." *Ortega v. Safeway Stores, Inc.,* 943 F.2d 1230, 1236 (10th Cir. 1991) (quoting *Drake v. City of Fort Collins,* 927 F.2d 1156, 1159 (10th Cir.1991) (quoting *Coe v. Yellow Freight Sys., Inc.,* 646 F.2d 444, 448 (10th Cir.1981) (quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977)))). When alleging disparate treatment, the plaintiff must prove by a preponderance of the evidence that the defendant had a discriminatory motive or intent. *Id.*

■ In comparison, a "claim of disparate impact exists when 'employment practices that are basically neutral in their treatment of different groups in fact fall more harshly on one group than another....'" *Id.* "A claim of disparate impact, unlike a claim of disparate treatment, does not require a finding of intentional discrimination. Indeed, 'the necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination.'" *Id.* at 1242 (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988)) *See International Bhd. of Teamster,* 431 U.S. at 335–36 n. 15, 97 S.Ct. at 1854–55 n. 15 (discussing differences between two theories of discrimination).

> Examples of employment practices that, in certain instances, have been held to have a disparate impact include standardized employment tests such as written aptitude tests, *see Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (disparate impact based on race), written tests of verbal skills, *see Washing-*

---

**6.** The defendant's reply briefly alludes to this issue.

ton v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (same) and height and weight requirements, see Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (disparate impact based on gender).

Hiatt v. Union Pacific R. Co., 859 F.Supp. 1416, 1432 (D.Wyo.1994).

Based upon these authorities, the court is uncertain whether the plaintiff is actually asserting a disparate impact claim. If the plaintiff were correct, every plaintiff alleging disparate treatment based upon the exercise of a manager's discretion may also automatically allege a disparate impact claim. Decocted to its true form, the plaintiff's disparate impact claim is more akin to an allegation that Boeing has engaged in a pattern or practice of disparate treatment of Mexican–Americans. See International Bhd. of Teamsters, 431 U.S. at 335–336, 97 S.Ct. at 1854–55; Pitre v. Western Elec. Co., Inc., 843 F.2d 1262, 1267 (10th Cir.1988). In light of these observations, it does not appear that the personnel files are relevant for to the plaintiff's "disparate impact" claim.

■ Nevertheless, the issue remains as to whether the plaintiff should be permitted to review the personnel records to evaluate the statistics provided by Boeing. To belabor the obvious, "[s]tatistical evidence may be highly relevant to a disparate impact claim." Libront v. Columbus McKinnon Corp., 832 F.Supp. 597, 607 (W.D.N.Y.1993); Hiatt 859 F.Supp. at 1432 ("The method of proof employed for establishing a presumption of discrimination in disparate impact cases 'usually focuses on statistical disparities, rather than specific incidents [of misconduct.]' ") (quoting Watson, 487 U.S. at 987, 108 S.Ct. at 2785). Statistical evidence may also be relevant in disparate treatment cases. See McDonnell Douglas v. Green, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973) ("[E]vidence that may be relevant to a [ ] showing of pretext includes … statistics as to petitioner's employment policy and practice."); E.E.O.C. v. Chicago Miniature Lamp Works, 947 F.2d 292, 297 (7th Cir. 1991); Pitre, 843 F.2d at 1267; Bauer v. Bailar, 647 F.2d 1037, 1045 (10th Cir.1981) ("Statistical evidence is, of course, relevant to a claim of disparate treatment and should be given proper effect by the courts.").

**Proportionality**

Boeing contends, and Aramburu apparently agrees, that it has provided the plaintiff with all of the statistical information relevant to the plaintiff's claims. The plaintiff desires to review all of the personnel files to get the whole story. The issue is whether the additional information sought is relevant, and if so, is the value of that information to the plaintiff disproportionate to the burden placed upon the defendant of producing that information.

While the personnel files may contain some information relevant to evaluating the statistics regarding Boeing's attendance policies, it appears that information is of limited or negligible value. At least at this point in time, the information provided by the defendant should be sufficient for the plaintiff to make, at the very least, a preliminary determination as to whether Mexican–Americans have suffered disparate treatment in the enforcement of Boeing's attendance policies.

■ In 1983, Rule 26 was amended "to add a sentence to deal with the problem of over-discovery." Notes of Advisory Committee on Rules, 1983 Amendment. "The objective is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry." Id. See 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2008.1 (2nd ed. 1994). In short, the plaintiff's need for the information in the personnel files is disproportionate to the substantial burden placed upon the defendant in producing the materials.

Notwithstanding this ruling, the plaintiff, within sixty (60) days of the date of the order, may seek reconsideration or modification of this order from this court if the discovery provided by the defendant warrants additional discovery. If the plaintiff's motion for reconsideration or modification demonstrates that additional discovery is ap-

propriate, the court will then determine an appropriate discovery order.

In conclusion, the court finds that the magistrate judge overestimated the relevancy of the personnel files and underestimated the burden of producing those files. Consequently, the court sustains Boeing's objection to production of the personnel files sought by the plaintiff in requests for production numbers 5, 6 and 7.

IT IS THEREFORE ORDERED that Boeing's objections (Dk. 90) to the memorandum and orders entered by the magistrate judge on September 22, 1994, (Dk. 87 and 88) are sustained in part and overruled in part as set forth in the body of this opinion.