Santiago ARAMBURU, Plaintiff,

v.

The BOEING . COMPANY d/b/a Boeing Commercial Airplane Group, Wichita Division Boeing Corporation, and Larry Whitesell, Defendants.

No. 93–4064–SAC.

United States District Court,
D. Kansas.

Dec. 21, 1995.

Harold S. Youngentob, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for Santiago Aramburu.

Gloria G. Flentje, J. Steven Massoni, Foulston & Siefkin, Wichita, KS, for Boeing Company, d/b/a Boeing Commercial Airplane Group, Wichita Division Boeing Corporation

dba Boeing Commercial Airplane Group, Larry Whitesell.

## MEMORANDUM AND ORDER

CROW, District Judge.

On March 22, 1993, the plaintiff, Santiago Aramburu, commenced this action against his former employer, The Boeing Company (Boeing), and his former supervisor, Larry Whitesell. Aramburu's amended complaint seeks to recover damages and secure equitable relief to redress the deprivation of rights secured by the Civil Rights Act of 1991, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, Title I of the American with Disabilities Act of 1990 (ADA), and the Kansas Act Against Discrimination (KAAD). The plaintiff claims that the defendants have discriminated against him on the basis of his Mexican American ancestry, as well as his work-related disability of carpal tunnel syndrome. Aramburu claims to have suffered discrimination at the hands of Larry Whitesell, his supervisor. The plaintiff's discrimination claims are based upon both disparate treatment and disparate impact theories. Aramburu also claims damages from a hostile work environment. Boeing denies the plaintiff's allegations, arguing that the plaintiff was terminated based upon his failure to maintain acceptable attendance.

On December 28, 1993, this court entered a memorandum and order dismissing the plaintiff's ADA claim and his protected speech claims under the First and Fourteenth Amendments of the United States Constitution. See Aramburu v. The Boeing Co., No. 93–4064–SAC, 1993 WL 544567, 1993 U.S.Dist. LEXIS 18620 (D.Kan. Dec. 29, 1993).

On September 22, 1994, the magistrate judge entered two separate memorandum and orders. See (Dk. 87 and 88). Each

order addressed certain issues presented by Aramburu's motion to compel discovery (Dk. 39). While certain portions of the plaintiff's requests for discovery were denied, in large part, those orders were generally favorable to the plaintiff.

On October 6, 1994, pursuant to Fed. R.Civ.P. 72(a) and D.Kan.Rule 604, Boeing filed objections to the September 22, 1994, memorandum and orders entered by the magistrate judge. On March 14, 1995, this court entered a memorandum and order sustaining in part and denying in part Boeing's objections to the memorandum and orders entered by the magistrate judge on September 22, 1994. See Aramburu v. Boeing, 885 F.Supp. 1434 (D.Kan.1995).

■ This case comes before the court upon the defendants' motion for summary judgment. The defendants seek summary judgment on all of Aramburu's claims. The defendants contend that Aramburu's claims are procedurally barred and/or fail on the merits. Aramburu responds, arguing that genuine issues of material fact preclude summary judgment.[1] The defendants filed a reply. The court, having considered the briefs of the parties and the applicable law, grants the defendants' motion for summary judgment.[2]

### Summary Judgment Standards

■ A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. Id. at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." Id. There

---

1. The court notes that the defendants' brief in support of their motion for summary judgment and Aramburu's response to the defendants' motion for summary judgment are each in excess of the forty-page limitation imposed by this court. Rather than strike the parties' briefs, the court simply admonishes counsel that all parties, except upon leave for good cause shown, are bound by the page limitations imposed by this court.

2. On September 29, 1995, the court entered a one page order granting Boeing's motion for summary judgment. This memorandum and order sets forth the factual and legal basis of the court's decision.

are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the nonmoving party's case."). When the nonmoving party will have the burden of proof at trial, " 'Rule 56(e)' ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun*, 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin*, 3

F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 929 (7th Cir.1995); *see Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.*, 849 F.2d at 1273.

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

### Uncontroverted Facts

The court has synthesized the uncontroverted facts to only those relevant to its decision. Although Aramburu contests several of the defendants' statements of uncontroverted facts, many of those objections are not supported by materials which the court may consider or are otherwise inappropriate. The court will make no attempt to specifically explain its resolution of the parties' numerous disputes regarding the uncontroverted facts, but instead has simply set forth the facts necessary for its decision. In rendering this decision, the court has only considered the materials submitted prior to September 29, 1995.

Santiago Aramburu is a male of Hispanic–American descent. The Boeing Company is a Delaware corporation conducting business in the State of Kansas. Larry Whitesell is a

white male currently employed by Boeing. At all times material to this case, Whitesell served as a manager in the major assembly area of Boeing's Wichita plant.

Aramburu was originally hired by Boeing on June 8, 1978, as a grade four sheet metal assembler. Aramburu held the same position when he was terminated on January 29, 1992. At all relevant times, Aramburu was a member of a bargaining unit covered by the Collective Bargaining Agreement between Boeing and the International Association of Machinists and Aerospace Workers (IAM) dated November 22, 1989. Aramburu's employment was governed by the Collective Bargaining Agreement and Boeing policies and procedures developed in accordance with that agreement.

The Collective Bargaining Agreement provides that an employee accumulates sick leave and vacation time in relation to the number of hours worked. The ratio varies according to the employee's seniority date. The first forty hours of credit earned each year are allocated sick leave, and all remaining credits are allocated to vacation. The Collective Bargaining Agreement states that employees are to be paid for absences charged to their accumulated sick leave, and are not to be penalized for such absences as long as they are reported to Boeing. If an employee has exhausted his sick leave, he may use vacation time to cover absences due to illness. The Collective Bargaining Agreement provides that an employee must seek advance approval for the use of vacation time. Management may deny requests for vacation dates if it believes that permitting vacation time as requested would interfere seriously with production requirements.

Although not specifically provided for in the collective bargaining agreement, supervisors apparently may, in their discretion, permit an employee to use vacation time without prior approval based on that employee's overall performance. For example, a super-visor may permit an excellent employee with a good attendance record to use vacation time without prior approval, but deny a similar request from an employee with a poor attendance record.[3] According to Boeing's attendance policy, an employee has unacceptable attendance and is subject to discipline when that employee accumulates any combination of infractions which equals or exceeds two full infractions within any eight week period. More than 4.0 hours per day of unpaid time constitutes one full infraction, while 4.0 hours or less of unpaid time per day constitutes one-half an infraction.

A full day of unpaid absence or consecutive days of unpaid absence for a verifiable medical reason constitutes one full infraction, while each day of a period of consecutive unpaid days of absence, for other than verifiable medical reasons are considered separate infractions. Any period of absence is not considered an infraction if it is a paid absence; is the result of an industrial injury or illness; is excused by a fully documented, approved, and authorized leave of absence; or is excused leave without pay approved in management's discretion based on the employee's work performance and attendance record and the shop's workload.

Supervisors may, in their discretion, grant excused leave without pay to an employee who wishes to leave early after completing his or her work but does not have sufficient leave or vacation time to cover the absence. Excused leave without pay may also be granted to an employee experiencing an extraordinary medical emergency or similar situation who has exhausted his or her sick leave and vacation time.

The progressive steps of corrective counseling and discipline utilized by Boeing provide that an employee with unacceptable attendance is eligible for a corrective counseling session with his or her supervisor. If the employee maintains acceptable attendance

---

**3.** The discretion afforded supervisors in determining how to treat certain absences is the crux of Aramburu's discharge and denial of transfer claims. Aramburu contends that Whitesell used that discretion to discriminate against him. Specifically, Aramburu claims that Whitesell unreasonably refused to grant his requests for leave after-the-fact, while other employees supervised by Whitesell were granted similar requests. Aramburu claims that Whitesell's denials of his requests were motivated by Whitesell's intentional discrimination on the basis of his ancestry and disability.

for six months following that session, the matter is considered resolved and any documentation is removed from the employee's essential file. Once removed from an employee's file, the documentation is maintained in historical files. If the employee has unacceptable attendance during that six months, he or she is eligible for a written Corrective Action Memo. The written Corrective Action Memo states that the employee's failure to improve his or her attendance will result in the further discipline, including possible termination. If the employee maintains acceptable attendance for twelve months following the Corrective Action Memo, the matter is considered resolved and any documentation is removed from the employee's essential file. If the employee has unacceptable attendance during that twelve months, he or she is eligible for termination. The imposition of discipline for attendance policy infractions is not automatic. Instead, the process must by initiated by the employee's supervisor.

From the earliest stages of his employment at Boeing, Aramburu demonstrated a pattern of poor attendance. Between 1979 and 1987, Aramburu received written discipline for unacceptable attendance almost once a year. Eight of the ten supervisors under whom Aramburu worked during that period gave him written discipline for unacceptable attendance and/or commented on his poor attendance in completing performance evaluations.

On February 15, 1988, a representative of Boeing, a representative of the IAM, and Aramburu signed a Letter of Understanding. That "last chance" letter stated that an unavoidable or unexcused absence during the following three months would result in Aramburu's immediate dismissal without recourse by Aramburu or the union. On April 19, 1988, Aramburu was terminated for failure to maintain acceptable attendance. Aramburu filed a grievance concerning that termination. Aramburu was reinstated in August 1988 without back pay and without loss of seniority on the condition that he obtain treatment for alcohol and drug abuse.

Larry Whitesell became Aramburu's supervisor in November 1990. According to Aramburu, none of his supervisors at Boeing except Whitesell discriminated against him based on his ancestry or alleged disability. In February, 1991, Aramburu was given a Corrective Action Memo by Whitesell, which stated that his attendance was unacceptable based on his absences on January 7, January 10, January 22, January 28, and February 11, 1991. Aramburu was warned that failure to improve his attendance would result in further discipline, including possible termination. Aramburu signed the Corrective Action Memo. However, that written discipline was not processed through Boeing's progressive discipline procedure.

On May 16, 1991, Aramburu was given a Corrective Action Memo by Whitesell which stated that Aramburu's attendance was unacceptable. Aramburu was warned that failure to improve his attendance would result in further discipline, including termination.

On July 31, 1991, Aramburu was given a Corrective Action Memo by Whitesell which stated that Aramburu's attendance was unacceptable. Aramburu was warned that his failure to improve his attendance would result in further discipline. Absences on June 5 (3 hours), June 7 (1.9 hours), June 24 (8 hours) and July 16 (8 hours), served as the basis for the July 31, 1991, Corrective Action Memo. Aramburu refused to sign the July 31, 1991, Corrective Action Memo because he disputed whether the absences were unexcused. Aramburu claims that he submitted forms to Whitesell for the June 7 and June 24 absences, and that Whitesell refused to give him sick leave or vacation time for those absences.

Between June 29 and July 15, 1991, the shop in which Aramburu worked has a two-week shutdown of operations. Employees in the shop could take vacation time or excused leave without pay during those two weeks. Alternatively, an employee could be temporarily assigned other work if available. Aramburu used vacation time for that two-week period.

Aramburu contends that he was absent on the first day back after the shutdown, July 16, 1991, because his truck had broken down while he was returning from Oklahoma. Ar-

amburu did not request prior approval time for that day, but called the Personnel Office to report his absence that day. According to Aramburu, he was absent the following day because he was sick. Aramburu's girlfriend called the Personnel Office to report his absence that day. Aramburu discussed the absences of July 16 and 17, 1991, with Whitesell when he returned to work on July 18, 1991. Whitesell gave Aramburu sick leave for the July 17, 1991, absence, but did not give him vacation time for the absence on July 15 because he failed to obtain prior approval for that vacation time.

Aramburu requested thirty hours of vacation time during the first week of August 1991 to serve a prison sentence for drunk driving. Although the request was submitted after the fact, Whitesell granted it.

Aramburu claims that he began experiencing pain in his right hand, arm, and shoulder during the summer of 1991. Because of the pain, he did not want to drive rivets. On October 4, 1991, Aramburu went to Boeing Medical to be placed on medical restrictions. The preliminary diagnosis indicated that Aramburu was suffering from possible early carpal tunnel syndrome. As a consequence, Aramburu was given temporary medical restrictions including a prohibition that he not lift more than 30 pounds with his right arm. Aramburu's use of vibrating tools was limited. Aramburu could, in his discretion, limit his use of such tools to a certain portion of the day.

Aramburu was scheduled for a follow-up appointment on October 11, 1991, to evaluate those restrictions, but forgot the appointment. Aramburu never returned to Boeing Medical for any further treatment or evaluation of his condition, nor had he sought any further medical treatment for carpal tunnel syndrome at the time of his deposition.

After receiving medical restrictions in 1991, Whitesell generally did not require Aramburu to drive rivets. Whitesell told Aramburu to monitor himself and to do the worker as he felt able. Aramburu did other work in the shop, including preparation, drilling and loading rivets, sealing and trimming skins.

Between September 1, 1991, and January 29, 1992, Whitesell granted Aramburu's request for sick leave on twelve days. During that same period of time, Whitesell granted Aramburu excused leave without pay on three days. During that same time period, Aramburu had unexcused leave without pay on nine days. Under Boeing's progressive discipline policy, those absences amounted to five and one-half infractions.

On January 10, 1992, a Proposed Termination for Aramburu for unacceptable attendance was submitted. The Proposed Termination identified the May 16, 1991, and the July 31, 1991 Corrective Action Memos as the basis for the termination, along with the most recent episode of unacceptable attendance. The Proposed Termination stated that Aramburu was absent without excuse for the full day on January 8, 1992, and for part of the day on November 19, December 3, and December 19, 1991. On January 27, 1992, Aramburu had an unexcused absence, but that absence was not considered in the termination decision. Boeing's attendance records show that Aramburu had 106.1 hours—more than two and one-half weeks—of unexcused absences during 1991. Whitesell authorized 42.1 hours—more than a week—of unexcused leave without pay for Aramburu during 1991. Aramburu was terminated on January 29, 1992, for failure to maintain acceptable attendance.

On March 23, 1994, Aramburu signed an application for hearing in his worker's compensation claim against Boeing. On November 7, 1994, Aramburu testified under oath in the worker's compensation hearing that he could not do the job from which he was terminated. In response to the question "In your opinion, if your weren't terminated, could you have continued to perform your work at Boeing after January 29, 1992?", Aramburu answered "No." The next question asked Aramburu "Why not?", to which Aramburu responded: "Well, because I was having trouble performing it before I got fired." Aramburu also testified that in his opinion he could not work as a sheet metal worker or any other job in his department for which he was qualified.

Highly summarized, Aramburu contends that he was generally hassled and harassed by Whitesell. Such instances of harassment include: other workers were treated more favorably with regard to using sick leave or vacation time for failing to show up for work on time; Aramburu was occasionally required to do or redo work performed or that should have been performed by other persons; Aramburu was required to work late when others were permitted to leave; Aramburu's work product was more closely scrutinized or criticized; despite his medical restrictions, Whitesell required Aramburu on one occasion to "shoot rivets" or face the loss of his job; and Aramburu was given more demeaning jobs than white males with similar disabilities.

Whitesell made comments critical of Aramburu and his work product. Whitesell accused Aramburu of being slow and lazy, to "get off [his] ass and get to work," Whitesell told Aramburu that he was "always complaining about something." Whitesell made other statements indicating his displeasure with Aramburu's work.

Pursuant to Article 22 of the Collective Bargaining Agreement between IAM and Boeing, an employee seeking a grade promotion must file an application with Boeing's Personnel Department. Aramburu never submitted an application for a grade promotion. Under the written company policy, an employee seeking a transfer to another shop must submit a request for transfer form. Aramburu never completed a request for transfer form, as he believed such an action would have been fruitless.[4]

### Timeliness of Complaint

■ At the outset the defendants raise several procedural problems which they con-tend bar Aramburu's claims. Specifically, the defendants contend that Aramburu's failure to file a timely charge with the Kansas Human Rights Commission bars his KAAD claims. See K.S.A. 44–1005(i) ("Any complaint filed pursuant to this act must be so filed within six months after the alleged act of discrimination, unless the act complained of constitutes a continuing pattern or practice of discrimination in which event it will be from the last act of discrimination."). Basically, the defendants contend that Aramburu filed his complaint on July 30, 1992, one day late. Aramburu responds, arguing that to be timely he was required to file his complaint six months, not 180 days, after January 29, 1992, or on July 30, 1992.

■ Based upon the legal arguments and evidence presented, the court is unable to conclude that Aramburu filed his complaint in an untimely manner so as to bar his KAAD claims.

### The Legal Framework Relevant to Claims of Disparate Treatment [5]

■ In the absence of direct evidence of discrimination, a plaintiff in Title VII actions "must abide by the complicated formula first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–805, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973), for proving discrimination by indirect evidence." Pilditch v. Board of Educ. of City of Chicago, 3 F.3d 1113, 1116 (7th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994); see Davis v. Chevron U.S.A., Inc., 14 F.3d 1082, 1087 (5th Cir. 1994) (referring to the inferential proof process as the three-step McDonnell Douglas–Burdine "minuet."). The plaintiff in such a

---

4. Apparently, informal requests for transfer were also permitted under certain circumstances. Aramburu claims that his informal requests for transfer were denied by Whitesell for discriminatory reasons.

5. The defendants argue and Aramburu apparently agrees that his claims that he was discriminated against on the basis of his ancestry are analyzed under the same standards under Title VII, the KAAD and § 1981. See Arzate v. City of Topeka, 884 F.Supp. 1494, 1504 (D.Kan.1995) (" 'The allocations of burdens under Title VII applies to proving intentional discrimination under section 1981 as well.' ") (quoting Durham v. Xerox Corp., 18 F.3d 836, 839 (10th Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994)); Woods v. Midwest Conveyor Co., 231 Kan. 763, 766–767, 648 P.2d 234 (1982); cf. Thomason v. Prudential Ins. Co., 866 F.Supp. 1329, 1333 n. 7 (D.Kan.1994). Aramburu's KAAD disability claims are also analyzed under this same general framework. Cf. White v. York Intern. Corp., 45 F.3d 357, 360–361 (10th Cir. 1995) (ADA case).

case must establish, by a preponderance of the evidence, a "prima facie" case of racial discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, ——, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407, 415 (1993).

In order to establish a prima facie case of discrimination, the plaintiff must demonstrate that (1) he belonged to the protected group; (2) that he was adversely affected by the defendant's employment decision; (3) that he was qualified for the position at issue; and (4) that he was replaced by a person outside the protected group. *See Hooks v. Diamond Crystal Specialty Foods, Inc.,* 997 F.2d 793, 799 (10th Cir.1993), *overruled in part on other grounds, Buchanan v. Sherrill,* 51 F.3d 227 (10th Cir.1995); *Luna v. City & County of Denver,* 948 F.2d 1144, 1147 (10th Cir.1991) (prima facie case where plaintiff claims he was denied promotion).

■■■ If the plaintiff is successful in establishing a prima facie case, the defendant is presumed to have discriminated against the plaintiff unless the defendant can articulate legitimate, non-discriminatory reasons for the employment decision. *Pilditch,* 3 F.3d at 1116. As the Supreme Court recently explained:

> Under the *McDonnell Douglas* scheme, "establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." [*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).] To establish a "presumption" is to say that a finding of the predicate fact (here, the prima facie case) produces "a required conclusion in the absence of explanation" (here, the finding of unlawful discrimination). 1 D. Louisell & C. Mueller, *Federal Evidence* § 67, p. 536 (1977). Thus, the *McDonnell Douglas* presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case—i.e., the burden of "producing evidence" that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." *Burdine,* 450 U.S. at 254 [101 S.Ct. at 1094]. "The defendant must clearly set forth, through the introduction of admissible evidence," reasons

for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *Id.,* at 254–255, and n. 8 [101 S.Ct. at 1094–1095 and n. 8]. It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," *id.,* at 253 [101 S.Ct. at 1093–1094].

*St. Mary's,* at ——, 113 S.Ct. at 2747, 125 L.Ed.2d at 416.

■■■ If the defendant fails at this juncture to meet his burden of production, "i.e., has failed to introduce evidence which, *taken as true,* would *permit* conclusion that there was a nondiscriminatory reason" for the employer's actions, the plaintiff is entitled to judgment as a matter of law. *St. Mary's,* at ——, 113 S.Ct. at 2748, 125 L.Ed.2d at 417–418. "If, on the other hand, the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *Id.* at ——, 113 S.Ct. at 2749, 125 L.Ed.2d at 418. "The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *Id.; see Pilditch,* 3 F.3d at 1116.

■■■ If the defendant has carried his burden of production, in order to prevail the plaintiff must demonstrate that the defendant's proffered explanation is pretextual *and* ultimately that he was the victim of intentional discrimination. *Pilditch,* 3 F.3d at 1116; *see St. Mary's,* at ——, 113 S.Ct. at 2752, 125 L.Ed.2d at 418, 421–422 ("[A] reason cannot be proved to be 'a pretext *for discrimination'* unless it is shown *both* that the reason was false, and that discrimination was the real reason."); *E.E.O.C. v. Flasher Co. Inc.,* 986 F.2d 1312, 1320 (10th Cir.1992). Therefore, "showing pretext alone is not sufficient for the plaintiff to carry the day, although it may support an inference that the real reason for the employer's action is dis-

criminatory." *Pilditch,* 3 F.3d at 1116 (citing *St. Mary's,* at ——, 113 S.Ct. at 2749, 125 L.Ed.2d at 418). *See Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1426 n. 4 (10th Cir.1993) ("A plaintiff's mere belief that defendant's explanation is pretextual or that he was treated unfairly, in and of itself, is insufficient as a matter of law to prove age discrimination."); *Cf. Hanson v. City Oklahoma,* No. 94–6089, 1994 WL 551336 (10th Cir. Oct. 11, 1994) (plaintiff's subjective beliefs as to the defendant's motive insufficient to create a genuine issue of fact of whether race was a motivating factor) (unpublished); *Money v. Great Bend,* 783 F.Supp. 563, 574 (D.Kan.1992) ("[T]he plaintiffs' 'feeling' that they are the victims of racial discrimination fails to demonstrate a material issue of fact in the absence of supporting evidence.").

### Analysis

■ Aramburu is unable to demonstrate the existence of a genuine issue of material fact precluding summary judgment on his claims of discriminatory discharge. First, Aramburu is unable to demonstrate that he was qualified to perform the job from which he was terminated. During the worker's compensation hearing, Aramburu testified under oath that he was not qualified to perform the essential job functions of his job as a grade four sheet metal assembler when he was terminated in January 1992. Aramburu also testified that he could not perform work for which he has the skills to perform.[6] Nor

has Aramburu identified any job that he could have performed had he not been terminated. *See White v. York Intern. Corp.,* 45 F.3d 357, 360–361 (10th Cir.1995). Under these circumstances, Aramburu is unable to prove an essential element of his prima facie case. *Cf., Nguyen v. IBP, Inc.,* 905 F.Supp. 1471, 1485 (D.Kan.1995) ("Even if the court were not to use this doctrine of judicial estoppel, the court believes that the proceedings before the ALJ, as reflected in his written order, including Nguyen's sworn testimony, Nguyen's medical records, and the vocational expert's testimony is such compelling evidence that a reasonable jury could not find that Nguyen could perform the essential functions of his work in the production department at the IBP.").[7]

■ Assuming, *arguendo,* that he was able to establish a prima facie case, Aramburu has not presented sufficient evidence to cast doubt on the defendants' non-pretextual reasons for firing him: excessive absenteeism. The court has carefully reviewed all of the information submitted by the parties regarding the facts and circumstances of Aramburu's termination. The court will make no effort to systematically or exhaustively address the multitude of arguments advanced by each of the parties. The short answer is this: Nothing argued by Aramburu or supported by materials upon which the court may rely in evaluating a motion for summary judgment demonstrate the existence of a

---

**6.** In the alternative, the defendants contend that in light of his testimony during the worker's compensation hearing, Aramburu should be judicially estopped from asserting a prima facie case of discrimination—*i.e.,* claiming that he was qualified. Pending before the magistrate at the time the court decided this motion was the defendants' motion to amend their answer to specifically include this defense. Aramburu opposed the defendants' motion to amend on several grounds. The defendants filed a reply, addressing Aramburu's arguments.

In light of its ruling, it is unnecessary for the court at this juncture in this case to specifically delve into an exhaustive discussion of judicial estoppel or related or similar doctrines. The court merely notes that the courts of this district have considered, discussed, and applied the doctrine of judicial estoppel or related doctrines in cases involving claims under the Americans with Disabilities Act (ADA). *See Smith v. Midland*

*Brake, Inc.,* 911 F.Supp. 1351 (D.Kan.1995) (thorough discussion of judicial estoppel and related doctrines or concepts); *Nguyen v. IBP, Inc.,* 905 F.Supp. 1471, 1484 (D.Kan.1995) ("The courts agree that an employee who represents on a benefits application that he is disabled and an unable to perform the duties of their former jobs is judicially estopped from arguing that he is capable of performing the essential functions of his former work.").

**7.** Aramburu nevertheless argues that he was qualified for other jobs at Boeing. Assuming that he is not barred from making this argument, he has not identified sufficient evidence from which a rational factfinder could conclude that he was qualified for other positions available at Boeing. Nor has he demonstrated a factual basis for his belief that Boeing's failure to transfer him to another position was based upon his ancestry or disability.

genuine issue of material fact regarding the defendants' reasons for his termination. Moreover, nothing presented by Aramburu creates a reasonable inference that he was treated differently by the defendants in regard to attendance due to either his ancestry or disability. In advancing his argument that he was treated differently than other workers, Aramburu fails to demonstrate that he was similarly situated to those employees whom he seeks to offer for comparison. *See Arzate v. City of Topeka*, 884 F.Supp. 1494, 1504 (D.Kan.1995). Consequently, the defendants are entitled to summary judgment on the plaintiff's discrimination claims stemming from his termination.

### Refusal to Transfer or Promote Claims [8]

At the outset, the defendants contend that the charge Aramburu filed with the Kansas Human Rights Commission only alleged discriminatory discharge and did not allege refusal to transfer claims. The defendants contend that Aramburu's refusal to transfer claims are not reasonably related to the allegations made in the charge, and thus he cannot pursue those claims under either Title VII or the KAAD in this case.[9]

Aramburu's response spans one paragraph. Aramburu argues (1) that he was unrepresented by counsel at the time that he filed his administrative charge and (2) "Clearly the fact that Mr. Aramburu was unable to obtain transfer or promotion out from under the discriminatory tyranny of Mr. Whitesell was related to the claim of illegal termination."

In *Guliford v. Beech Aircraft Corp.*, 768 F.Supp. 313 (D.Kan.1991), *aff'd*, 993 F.2d 1551 (10th Cir.1993) (Table), this court discussed the requirements for exhaustion of administrative remedies under Title VII:

> Before a Title VII suit is filed in federal court, the aggrieved individual must exhaust administrative remedies. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974). The administrative remedies are exhausted when the claimant files a timely charge of discrimination with the appropriate administrative agency and then receives and acts upon the statutory notice of the right to sue. *Id.* The enforcement of these exhaustion requirements ensures the EEOC the opportunity to conduct its investigatory and conciliatory procedures before any suit is filed on the charges. *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir.1983).

The exhaustion requirements are enforced in part by the general rule that the judicial complaint can include only claims which were the precise subject of the administrative charge and any claims of " 'discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC.' " *Brown v. Hartshorne Public School Dist. No. 1*, 864 F.2d 680, 682 (10th Cir.1988) (quoting *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir.1973)). The proper scope of the judicial complaint is determined from both the EEOC charge and the EEOC investigation. *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir.1990). The EEOC charge is construed liberally. *Sosa*, 920 F.2d at 1456; *Lange v. Cigna Individual Financial Services Co.*, 759 F.Supp. 764, 767 (D.Kan.1991); *see also Powers v. Grinnell Corp.*, 915 F.2d 34, 38–39 (1st Cir. 1990) (EEOC charge is not a "blueprint for the litigation" or a "common-law pleading," nor need it presage exactly the judicial pleadings; instead, it is "a jurisdictional springboard" for the EEOC's investigation of discriminatory practices); *Rush v. McDonald's Corp.*, 760 F.Supp. 1349, 1355 (S.D.Ind.1991) (Charge of discrimination is construed "with the utmost liberality").

---

8. Aramburu apparently abandons his refusal to promote claim. *See* Aramburu's response brief (Dk. 127) at 42 (*"Plaintiff can prove a Prima Facie Case For Discriminatory Refusal to Transfer But He Does Not, Under Boeing Policy, Present a Prima Facie Case of Refusal to Promote."*)

9. The defendants concede that Aramburu may assert a claim for refusal to transfer related to events occurring after November 21, 1991, under § 1981 despite his failure to assert those claims in his administrative charge. *See Rivers v. Roadway Express Inc.*, —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).

The court must also consider whether the EEOC's investigation actually included, or should have included, the additional claims not expressly stated in the administrative charge. "[T]he critical question is whether the claims set forth in the civil complaint come within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Powers,* 915 F.2d at 39 (citations omitted); see also *Sosa,* 920 F.2d at 1456; *Whitten v. Farmland Industries, Inc.,* No. 88–2637–0 (D.Kan. Apr. 25, 1991) (1991 WL 75695, 1991 U.S.Dist. Lexis 6075); *Rucker v. Frito–Lay, Inc.,* No. 89–4172–S (D.Kan. Nov. 21, 1990) (1990 WL 203167, 1990 U.S. Dist. Lexis 16566). In applying these rules, the court must remain mindful that the EEOC's investigative and conciliatory role should not be frustrated nor the employer deprived of all reasonable notice. *Babrocky v. Jewel Food Co. and Retail Meatcutters,* 773 F.2d 857, 863 (7th Cir. 1985).

768 F.Supp. at 316. *See Wagher v. Guy's Foods, Inc.,* 256 Kan. 300, 309, 885 P.2d 1197 (1994) (exhaustion of administrative requirements under KAAD); *Van Scoyk v. St Mary's Assumption Parochial School,* 224 Kan. 304, 306–307, 580 P.2d 1315 (1978); *Simmons v. Vliets Farmers Coop. Ass'n,* 19 Kan.App.2d 1, 861 P.2d 1345 (1993) (exhaustion of administrative remedies requirements under KAAD).

In this case, Aramburu has not endeavored in a meaningful fashion, nor with specific reference to the record, to demonstrate that his claims for failure to transfer are reasonably related to his administrative charge. Aramburu's treatment of this issue is hardly exhaustive—in large part his arguments require a leap of faith or speculation by the court as to whether his claims for failure to transfer are reasonably related to his discrimination charges. *See Weiss v. Coca–Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir.1993) (plaintiff's job transfer claim was not reasonably related to her EEOC charges alleging only training, discharge and sexual harassment claims).

 Assuming, *arguendo,* that Aramburu's claims for failure to transfer are reason-ably related to his discrimination claims, he nevertheless fails to demonstrate that a genuine issue of material fact precludes summary judgment. Like his discriminatory discharge claim, Aramburu cannot establish that he was qualified for the position that he sought, nor can he demonstrate that his informal request for transfer was rejected on an impermissible basis.

### Hostile Work Environment

 Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

As we made clear in *Meritor Savings Bank v. Vinson,* 477 U.S. 57 [106 S.Ct. 2399, 91 L.Ed.2d 49] (1986), this language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment. *Id.,* at 64 [106 S.Ct. at 2404], *quoting Los Angeles Dept. of Water and Power v. Manhart,* 435 U.S. 702, 707, n. 13 [98 S.Ct. 1370, 1375, n. 13, 55 L.Ed.2d 657] (1978) (some internal quotation marks omitted). When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," 477 U.S., at 65 [106 S.Ct. at 2405], that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *id.,* at 67 [106 S.Ct. at 2405] (internal brackets and quotation marks omitted), Title VII is violated.

This standard, which we reaffirm today, takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury. As we pointed out in *Meritor,* "mere utterance of an ... epithet which engenders offensive feelings in a employee," *ibid.* (internal quo-

tation marks omitted) does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris v. Forklift Systems, Inc.*, 510 U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 301–302 (1993); *see Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1418 (10th Cir.1993); *Honce v. Vigil*, 1 F.3d 1085, 1089 (10th Cir.1993).

 "To prevail under a hostile work environment theory, the plaintiff must show that ... conduct 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" *Martin*, 3 F.3d at 1418 (*quoting Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)).

Specifically, it must be shown that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, *Meritor*, 477 U.S. at 67 [106 S.Ct. at 2405], and (2) the harassment was racial or stemmed from racial animus. General harassment if not racial or sexual is not actionable. The plaintiff must show "'more than a few isolated incidents of racial enmity.'" *Hicks*, 833 F.2d at 1412 (*quoting Snell v. Suffolk Co.*, 782 F.2d 1094, 1103 (2d Cir. 1986)). Instead of sporadic racial slurs, there must be a steady barrage of oppro-

brious racial comments. *Id.* at 1412–13 (*citing Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir.1981)).

*Bolden v. PRC Inc.*, 43 F.3d 545, 550–50 (10th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995). "Whether the ... conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir.1987) (citations omitted). "One of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Purrington v. University of Utah*, 996 F.2d 1025, 1029 (10th Cir.1993) (emphasis in original) (*quoting Hicks*, 833 F.2d at 1415).

 The defendants contend that because Aramburu's administrative charge did not advance any assertion of a hostile work environment claim, and because Aramburu's hostile work environment claim is not reasonably related to his discriminatory discharge claim, they are entitled to summary judgment.[10] In support of their argument, the defendants cite Judge Rogers' opinion in *Reese v. Goodyear Tire & Rubber Co.*, 859 F.Supp. 1381, 1387 (D.Kan.1994). In *Reese*, Judge Rogers found that the plaintiff's racial harassment claim was

beyond the scope of the charges plaintiff made to the Kansas Commission on Civil Rights. These charges only mentioned plaintiff's discharge and post-discharge retaliation. In *Rush v. McDonald's Corp.*, [966 F.2d 1104 (7th Cir.1992)], the court considered an administrative charge alleging termination and racial discrimination. It was similar to the ones made by plaintiff prior to this case. The court concluded

---

10. The defendants concede that despite his failure to exhaust his administrative remedies, Aramburu may assert a hostile work environment claim under § 1981 concerning acts occurring after November 21, 1991—the effective date of the Civil Rights Act of 1991. *See Rivers v. Roadway Express, Inc.*, —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) (1991 Amendments to § 1981 do not apply retroactively to acts which

occurred prior to November 21, 1991); *see Williams v. Carrier Corp.*, 889 F.Supp. 1528, 1530 (M.D.Ga.1995) ("Prior to its modification in 1991, a hostile environment claim was not actionable under § 1981.").

The court notes, however, that the events Aramburu identifies as the basis for his hostile work environment claim are generally not tied to any specific dates.

that a racial harassment claim, which was not mentioned in the administrative charge, could not be raised in the Title VII court action. We agree with this result. 859 F.Supp. at 1387. Aramburu responds, arguing that Judge Rogers "nevertheless proceeded to consider the substance of plaintiff's claim and found it wanting."

Like his failure to transfer claims, Aramburu has done little to demonstrate that his hostile work environment claim is reasonably related to the claims asserted in his administrative charge. Although his charge must be liberally construed, Aramburu fails both legally and factually to satisfy the court that his hostile work environment claim is reasonably related to the claims advanced in his administrative charge.

 Assuming, *arguendo*, that Aramburu's hostile work environment claim is reasonably related to his discriminatory discharge claim, Aramburu has nevertheless failed to introduce sufficient evidence for a rational factfinder to conclude that he was subject to a hostile work environment based upon his ancestry or disability. Although Aramburu's work environment may not have been ideal, there is not an adequate showing that the defendants' conduct unreasonably interfered with Aramburu's work performance or created an intimidating, hostile, or offensive working environment. Although it might be fair to say that Whitesell may not have liked Aramburu on a personal level and may have even "picked" on Aramburu on some occasions, there is no showing that his conduct stemmed from ancestral animus or another impermissible basis. The defendants correctly argue that neither federal or state law "mandate congenial relationships between supervisors and employees." *Cf. Arzate,* 884 F.Supp. at 1503 ("The fact that coworkers do not like the plaintiff, or that he does not like them, is not the basis of a cognizable Title VII racially hostile environment claim.").

### Disparate Impact

Of the 129 employees in Boeing's Wichita plant terminated for unacceptable attendance between 1988 and 1992, only two were Hispanic–American males, one of those being Aramburu.

Aramburu apparently concedes that he has not introduced sufficient evidence of statistical disparity for a rational factfinder to find for him on his disparate impact claim. *See Aramburu,* 885 F.Supp. at 1443–1444 (summarizing disparate impact claims). Boeing is entitled to summary judgment on Aramburu's disparate impact claim.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (Dk. 103) is granted.