Melvin REID, et al., Plaintiffs,

v.

LOCKHEED MARTIN AERONAUTICS CO. and Lockheed Martin Corp., Defendants.

Farris Yarbrough, et al., Plaintiffs,

v.

Lockheed Martin Aeronautics Co., et al., Defendants.

Nos. Civ.A. 1:00CV1182JOF, Civ.A. 1:00CV1183JOF.

United States District Court, N.D. Georgia, Atlanta Division.

March 9, 2001.

**380**

J. Keith Givens, Cochran, Cherry, Givens & Smith, Dothan, AL, Josie Anne Alexander, Alexander & Associates, Atlanta, GA, Hezekiah Sistrunk, Jr., Cochran, Cherry, Givens, Smith & Sistrunk, Atlanta, GA, Jock Michael Smith, Cochran, Cherry, Givens & Smith, Tuskegee, AL, Johnnie L. Cochran, Jr., Cochran, Cherry, Givens & Smith, Los Angeles, CA, for Plaintiffs.

William Henry Boice, Daniel F. Piär, Kilpatrick Stockton, Atlanta, GA, R. Lawrence Ashe, Jr., Nancy E. Rafuse, Paul, Hastings, Janofsky & Walker, Atlanta, GA, Martha Marie Blankenship, Lockheed Martin Aeronautical Systems Company Legal Department, Marietta, GA, Robert S. Giolito, Megan Elizabeth Gideon, Lesley Ann Troope, Stanford, Fagan & Giolito, Atlanta, GA, for Defendants.

### ORDER

FORRESTER, District Judge.

This matter is before the court on Plaintiffs' motions to compel documents withheld under the self-critical analysis privilege.

## I. STATEMENT OF THE CASE

Plaintiffs filed these two civil rights actions on May 10, 2000, alleging that Defendants, among other things, have engaged in racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981 a ("Title VII"). On December 12, 2000, Plaintiffs filed motions to compel Defendants Lockheed Martin Aeronautics Company and Lockheed Martin Corporation (collectively referred to as "Lockheed") to produce certain documents responsive to Plaintiffs' first requests for production. Among the issues raised in these motions was Defendants' assertion of the self-critical analysis privilege ("SCA"). On February 7, 2001, Plaintiffs filed second motions to compel documents withheld under the SCA. The documents sought are grouped into three categories: (1) Affirmative action plans submitted to the Office of Federal Contract Compliance Programs ("OFCCP"); (2) data processing reports concerning compliance with OFCCP goals; and (3) reports commissioned by Lockheed regarding the company's work culture.[1] The court held a hearing on these motions on February 8, 2001, and granted in part and denied in part Plaintiffs' first motions to compel. The court held in abeyance ruling on the second motions to compel concerning the SCA.

The court held a second hearing on March 1, 2001 to consider discovery disputes that arose after the court's first hearing. In this second hearing, the court again held in abeyance Plaintiffs' second motions to compel and directed Lockheed to produce samples of the withheld documents for *in camera* review on Monday, March 5, 2001. Noting that Plaintiffs had challenged only the assertion of the

1. Plaintiffs also requested the minutes, agenda, and program notes for Lockheed's Audit and Ethics Committee. Lockheed represented that these documents were produced to Plaintiffs, and the motions to compel are therefore moot as to these documents.

SCA, the court stated that Lockheed could exclude from the *in camera* review any documents to which another privilege had been claimed without challenge. On March 5, 2001, Lockheed produced the following documents for *in camera* inspection: (1) Lockheed's 1997 affirmative action plan with appendices and exhibits, including impact ratio analyses, job group analyses, availability analyses, utilization analyses, and goals; (2) three reports, numbered 87–307, 87–308, and 87–309, concerning utilization goals for the various branches at Lockheed; (3) job area acceptance range reports; (4) back-up data reports for layoffs, transfers, terminations and promotions; (5) reconciliation reports; (6) a publication produced by the United States Department of Education concerning educational statistics; (7) control and compare reports for Lockheed's databases; (8) worksheets for determining eight-factor analyses required for OFCCP reporting; (9) materials concerning progress toward affirmative action goals; and (10) reports for Lockheed's Diversity Council relating to the company's work culture.

## II. DISCUSSION

Lockheed claims that each of the aforementioned documents is subject to the SCA and therefore need not be produced. Plaintiffs, on the other hand, question the SCA's applicability in the employment discrimination context and contend that the privilege cannot be applied to the instant dispute. Alternatively, Plaintiffs argue that, even should the privilege be found to apply in this case, the documents at issue do not fall within the scope of the SCA. For the following reasons, the court concludes that the SCA may apply in the employment discrimination context and does so under the circumstances of this case. The court further finds that, while certain of the withheld documents are protected by the SCA, others fall outside the scope of the privilege and should be produced.

A. *The SCA's Applicability in Employment Discrimination Cases*

1. *Origins and Development of the SCA*

■ The SCA is generally said to have originated in *Bredice v. Doctors Hosp., Inc.,*

50 F.R.D. 249 (D.D.C.1970), *aff'd*, 479 F.2d 920 (C.A.D.C.1971) (table disposition). In that medical malpractice case, the court held that the plaintiff was not entitled to discover the retrospective minutes and reports of certain medical staff meetings in which the physicians critically reviewed and analyzed the treatment provided by the hospital. Noting that the purpose of the staff meetings was the improvement of the efficiency of the medical procedures and techniques utilized in patient care, the court concluded that confidentiality was essential to candid deliberations and that an "overwhelming public interest" in maintaining that candor provided the basis for a qualified privilege. *Id.* at 250–51. Accordingly, absent evidence of extraordinary circumstances, the court refused to compel production of the requested documents. *Id.* at 251.

The first application of the SCA in the employment discrimination context occurred in *Banks v. Lockheed–Georgia Co.*, 53 F.R.D. 283 (N.D.Ga.1971) (O'Kelley, J.). In *Banks,* the plaintiffs sought the production of "[a]ll analyses, reports, interim reports, and any other written material prepared by the [defendant's] equal employment opportunity 'team....' " *Id.* at 284. The equal employment opportunity team had been commissioned by the defendant both to study the defendant's equal employment opportunity problems and to determine the progress of the defendant's affirmative action plans. The team's findings were produced in an internal report, which in turn had been used to produce a formal report, pursuant to Executive Order 11246, which was submitted to the predecessor of the OFCCP. The defendant agreed to produce the formal report presented to the government, but it objected to producing the internal report on the ground that it contained self-critical analysis. Relying on *Bredice,* the court agreed that the internal report need not be produced, explaining that "it would be contrary to [public] policy to discourage frank self-criticism and evaluation in the development of affirmative action programs of this kind." *Id.* at 285. The court further explained that disclosure of the internal report, which contained the writ-

ten opinions and conclusions of the defendant's own research team, "would discourage companies ... from making investigations which are calculated to have a positive effect on equalizing employment opportunities." *Id.* Accordingly, the court denied the plaintiff's motion to compel.

In the thirty years since *Bredice* and *Banks* were decided, the existence and parameters of the SCA have been anything but clear. As one court has noted, "[t]he Supreme Court and the circuit courts have neither definitively denied the existence of such a privilege, nor accepted it and defined its scope." *Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423, 425 n. 1 (9th Cir.1992). A few federal appellate courts, however, have suggested that the policy rationales underlying the SCA are valid. *See, e.g., ASARCO, Inc. v. NLRB,* 805 F.2d 194, 199–200 (6th Cir.1986) (explaining policies for protecting self-critical analysis and holding that company need not provide self-critical internal reports to National Labor Relations Board); *Coates v. Johnson & Johnson,* 756 F.2d 524, 551–52 (7th Cir.1985) (stating in *dicta* that "prevailing view is that self-critical portions of affirmative action plans are privileged and not subject to discovery by plaintiffs"). A split among the district courts in employment discrimination cases has contributed to the lack of clarity. *Compare, e.g., Cruz v. Coach Stores, Inc.,* 196 F.R.D. 228, 232 (S.D.N.Y.2000) (expressing doubt as to whether SCA "should be recognized at all"); *Aramburu v. Boeing Co.,* 885 F.Supp. 1434, 1440–41 (D.Kan.1995) (concluding SCA does not apply in Title VII cases); *Tharp v. Sivyer Steel Corp.,* 149 F.R.D. 177, 182 (S.D.Iowa 1993) (concluding SCA "should not be recognized in the field of employment discrimination litigation"), *with Sheppard v. Consolidated Edison Co.,* 893 F.Supp. 6, 7–8 (E.D.N.Y.1995) (applying SCA to protect internal studies relating to equal employment opportunities); *Roberts v. National Detroit Corp.,* 87 F.R.D. 30, 32–33 (applying SCA to protect self-critical analysis in mandatory affirmative action plans, equal employment opportunity reports, and federal contract compliance reports, as well as voluntary internal investigations). *See also Gatewood v. Stone Container Corp.,* 170 F.R.D. 455, 459 (S.D.Iowa 1996) (recognizing SCA but declining to apply it to particular circumstances of that case); *Harding v. Dana Transp., Inc.,* 914 F.Supp. 1084, 1099–1101 (D.N.J.1996) (same); *Webb v. Westinghouse Elec. Corp.,* 81 F.R.D. 431, 433–35 (E.D.Pa.1978) (same).

### 2. The University of Pennsylvania Decision

The uncertainty surrounding the SCA was furthered with the Supreme Court's decision in *University of Pennsylvania v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), which rejected a common law privilege protecting from Equal Employment Opportunity Commission ("EEOC") investigation those communications made in the process of an academic peer review. The plaintiff in *University of Pennsylvania,* a professor at the Wharton School of Business, filed a charge of gender and racial discrimination with the EEOC after she was denied tenure. The charge alleged that the plaintiff's department chair had sexually harassed her. The charge further alleged that, after the plaintiff insisted that their relationship remain professional, the department chair submitted a negative letter to the university's personnel committee, which possessed ultimate responsibility for tenure decisions. Additionally, the plaintiff's charge alleged that her qualifications were equal to or better than five male faculty members receiving more favorable treatment. *Id.* at 185, 110 S.Ct. 577.

As part of its investigation of the charge, the EEOC requested various documents from the university. The university refused to provide certain information, however, and the EEOC subpoenaed the plaintiff's tenure-review file and the tenure files of the five male faculty members named in the charge. The university still refused to produce several documents that it characterized as "confidential peer review information," and the EEOC eventually sought enforcement of the subpoena in federal court. Both the district court and the court of appeals held that the university must turn over the withheld documents. *Id.* at 186–88, 110 S.Ct. 577.

The Supreme Court affirmed, finding that there was no common law privilege, under Federal Rule of Evidence 501, that allowed the university to withhold the tenure files. The Court began its analysis by noting that, while Rule 501 does not "freeze the law of privilege," the judicial authority to create and apply evidentiary privileges should not be used expansively. *Id.* at 189, 110 S.Ct. 577. Rather, the Court explained that privileges should apply only when it "promotes sufficiently important interests to outweigh the need for probative evidence." *Id.* (quoting *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)).

Noting also that this type of balancing is "particularly a legislative function," the Court concluded that Congress had already considered the competing interests at issue and decided against privileging academic peer review materials. Important to the Court's discussion was the fact that Congress had initially exempted educational institutions from compliance with Title VII, but later amended the statute so as to eliminate this exemption. The reasons underlying this extension of Title VII, as revealed in the legislative history, included "the lack of access for women and minorities to higher ranking (*i.e.,* tenured) academic positions." *Id.* at 190, 110 S.Ct. 577. The legislative history also revealed that opponents of the extension were concerned that "enforcement of Title VII would weaken institutions of higher education by interfering with decisions to hire and promote faculty members." *Id.* Such history demonstrated that Congress had considered the competing policies underlying the claimed privilege for peer review documents but had chosen not to create such a privilege. *Id.* at 189, 110 S.Ct. 577.

The Court found further support for its rejection of the academic peer review privilege in the procedures governing EEOC investigations of discrimination charges. Noting that Title VII obligated the EEOC to investigate charges of discrimination, the Court explained that the statute gave the EEOC access to "any evidence of any person being investigated ... that relates to unlawful employment practices covered by [the Act] and is relevant to the charge under investigation." *Id.* at 191 (quoting 42 U.S.C. § 2000e–8(a)) (alterations in original). The Court found no privilege or qualification of this broad provision in the statute itself. *Id.* Moreover, the statutory scheme demonstrated that Congress had considered the asserted interest in confidentiality by subjecting to criminal penalties any EEOC employee who made public information obtained by the EEOC in the course of its investigation. *Id.* at 192, 110 S.Ct. 577. As such, Congress had provided the safeguard it deemed appropriate, and the Court would not go further than Congress thought necessary. *Id.*

Additionally, the nature of the plaintiff's charge, as well as the obligations imposed upon the EEOC, favored rejecting the creation of an academic peer review privilege. The Court explained that disclosure of the peer review materials at issue would often be necessary for the EEOC to determine whether illegal discrimination had taken place. *Id.* at 193, 110 S.Ct. 577. Also, the Court concluded that the adoption of such a privilege "would place a substantial litigation-producing obstacle in the way of the Commission's efforts to investigate and remedy alleged discrimination." *Id.* at 194, 110 S.Ct. 577. Recognizing that a university might utilize the privilege in a manner designed to frustrate the EEOC's mission, the Court stated its "reluctan[ce] to 'place a potent weapon in the hands of employers who have no interest in complying voluntarily with [Title VII], who wish instead to delay as long as possible investigations by the EEOC.'" *Id.* (quoting *EEOC v. Shell Oil Co.,* 466 U.S. 54, 81, 104 S.Ct. 1621, 80 L.Ed.2d 41 (1984)). Finally, the Court observed that the academic peer review privilege had no perceptible limit and had no basis in precedent. *Id.* at 194–95, 110 S.Ct. 577.

3. *The status of the SCA after University of Pennsylvania*

Although *University of Pennsylvania* did not address the SCA specifically, some courts have concluded that the privilege cannot survive *University of Pennsylvania,* especially in the area of Title VII. *See, e.g., Aramburu,* 885 F.Supp. at 1440–41. Several district courts in this circuit, however, have

clearly held that the privilege survives *University of Pennsylvania*, although most of these decisions were rendered in contexts other than employment discrimination litigation. *See, e.g., Joiner v. Hercules, Inc.*, 169 F.R.D. 695 (S.D.Ga.1996) (applying SCA to evaluations of compliance with environmental laws); *Reichhold Chem., Inc. v. Textron, Inc.*, 157 F.R.D. 522 (N.D.Fla.1994) (same); *John v. Trane Co.*, 831 F.Supp. 855 (S.D.Fla. 1993) (applying SCA to employment discrimination claim). *See also United States ex rel. Falsetti v. Southern Bell Tel.*, 915 F.Supp. 308 (N.D.Fla.1996) (recognizing SCA but finding it inapplicable to *qui tam* litigation). The Eleventh Circuit has not spoken to the issue, and the law therefore remains unclear. The court reiterates, however, that nothing in *University of Pennsylvania* specifically addressed the SCA, nor did that decision establish any categorical rules for applying privileges in Title VII cases. Rather, that decision demonstrates that the application of privileges under Rule 501 should be decided on a case-by-case basis. *See University of Pennsylvania*, 493 U.S. at 189, 110 S.Ct. 577; *see also Trammel v. United States*, 445 U.S. 40, 47, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). Distinctions between this case and *University of Pennsylvania*, as well as the purposes of Title VII, lead this court to conclude that *University of Pennsylvania* does not prohibit application of the SCA in this case.

To begin with, unlike *University of Pennsylvania*, there is no evidence in the legislative history or statutory scheme that Congress considered the competing policy interests surrounding the SCA and chose to strike the balance itself. As demonstrated, the Court in *University of Pennsylvania* thought it important that Congress chose not to create a privilege for academic peer review even though the legislative history revealed that it was conscious of the policy concerns supporting such a privilege. The court is unaware of any similar evidence in Title VII's legislative history that Congress considered and rejected the specific policy concerns supporting the SCA. Moreover, the congressional safeguard for confidential-

ity that was present in *University of Pennsylvania*, the criminal penalty provision of § 2000e–8, is inapplicable to the instant dispute. As such, neither the structure of the statute nor the history surrounding its enactment establish congressional consideration and action as to the relevant concerns.

■ Additionally, the documents sought by Plaintiffs in this case are significantly different from those at issue in *University of Pennsylvania*. As the *University of Pennsylvania* Court noted, the tenure files sought in that case likely contained the very information necessary for the EEOC to investigate the plaintiff's charge of discrimination. As explained by another district court in this circuit:

> the chairman's letter to the tenure committee might have contained evidence of his past discriminatory actions and his intent to discriminate, or it might have contained evidence in defense. Further, if the chairman had otherwise affected the tenure decision in an unlawful manner, the letter itself when transmitted (which was presumably negative) might have been an act actionable under Title VII.

*Falsetti*, 915 F.Supp. at 311. Similarly, the tenure files of the male faculty members may have contained evidence of the very charges brought by the plaintiff—that she was being treated less favorably than her male colleagues despite having equal or better qualifications. *See University of Pennsylvania*, 493 U.S. at 193, 110 S.Ct. 577. In other words, the materials sought by the EEOC in that case constituted contemporaneous records of the events giving rise to the plaintiff's charge, and may even have been the communicative acts on which the charge was premised. *See Falsetti*, 915 F.Supp. at 311. By contrast, the SCA generally protects reflective materials that analyze and seek to improve the employer's comprehensive approach to equal employment opportunity.[2] The documents sought in this case, for example, concern retrospective evaluations of

---

**2.** For these reasons, some courts have aptly noted that the SCA rests on many of the same policy considerations as does the exclusion of subse-

quent remedial measures found in Federal Rule of Evidence 407. *See, e.g., Reichhold*, 157 F.R.D. at 524.

Lockheed's overall performance in the area of equal employment opportunities; they are not specifically related to the incidents underlying Plaintiffs' claims. *Cf. Whittingham v. Amherst College,* 164 F.R.D. 124, 130–31 (D.Mass.1995) (suggesting that documents privileged by SCA "would be divorced from individual cases [and] would reflect [the employer's] avowed commitment to affirmative action"); *Harding,* 914 F.Supp. at 1101 (noting that *Banks* protected material underlying "a generalized report which reviewed the company's overall record").

Not only are the nature of the documents different, but this case involves a significantly different context than that of *University of Pennsylvania.* The documents at issue here are sought not for purposes of an EEOC investigation, but rather for use in a civil suit challenging Lockheed's Title VII behavior. This distinction is important because it implicates the policy objectives of Title VII itself. The Court in *University of Pennsylvania* clearly explained that it was reluctant to create a weapon that could be used by employers to thwart compliance with Title VII, and it strongly suggested that the academic peer review privilege would lead to more litigation of employment discrimination claims rather than conciliation by the EEOC. The SCA, on the other hand, encourages candid evaluation and voluntary compliance with employment discrimination laws, and it therefore facilitates the objectives of Title VII without producing litigation. *See, e.g., Kolstad v. American Dental Ass'n,* 527 U.S. 526, 545, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) ("Dissuading employers from implementing programs or policies to prevent discrimination in the workplace is directly contrary to the purposes underlying Title VII."); *Faragher v. Boca Raton,* 524 U.S. 775, 806, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (stressing need "to recognize the employer's

affirmative obligation to prevent violations and give credit here to employers who make reasonable efforts to discharge their duty"); *Burlington Indus. v. Ellerth,* 524 U.S. 742, 764, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (noting "Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees").[3] As this court explained nearly twenty years ago, allowing Plaintiffs access to self-critical and evaluative documents "would discourage companies from making investigations which are calculated to have a positive effect in equalizing employment opportunities and would not be conducive to compliance with Title VII." *Woods v. Coca–Cola Co.,* 35 Fair Empl.Prac.Cas. (BNA) 151, No. C80–1201A, 1982 WL 31056, *4 n. 2 (N.D.Ga. June 10, 1982) (Forrester, J.).

The SCA has existed in this district for thirty years, and as evidenced by *Woods,* the undersigned has applied it in the employment discrimination context. The foregoing discussion demonstrates that *University of Pennsylvania* does not compel a contrary result on the facts of this case and that the SCA generally furthers the purposes of Title VII. On balance, encouraging employers to undertake candid self-evaluations of their performance in the equal employment opportunity area is a sufficiently important interest to warrant the privilege. Accordingly, the court concludes that the SCA may apply in Title VII cases generally as well as in this case specifically.

**B.  *The Scope of the SCA and its Application to Specific Documents***

Having determined that the SCA applies, the court must now decide the proper scope of the privilege and whether the withheld documents fall within the privilege. In so doing, the court remains cognizant that privileges should be strictly construed. *Universi-*

---

3. Because the statute's "primary objective" is "a prophylactic one," *Kolstad,* 527 U.S. at 545, 119 S.Ct. 2118, the court disagrees with those decisions that refuse to apply the SCA by focusing chiefly on litigation instead of prevention. *See, e.g., Tharp,* 149 F.R.D. at 183–84 (stating that application of SCA in employment discrimination cases "would impede the progress of that litigation and therefore contravene the public interest served by such litigation"). While the

court agrees that private litigation has done much to encourage equality in the workplace, Title VII was ultimately purposed "not to provide redress but to avoid harm." *Faragher,* 524 U.S. at 806, 118 S.Ct. 2275. As explained above, the SCA furthers that purpose by encouraging employers to take positive steps to prevent discrimination without the necessity of judicial intervention.

*ty of Pennsylvania,* 493 U.S. at 189, 110 S.Ct. 577. Thus, the court begins by outlining some basic parameters for determining when particular information falls within the scope of the SCA.

Courts recognizing the SCA have generally insisted on at least three criteria: (1) "the information must result from a critical self-analysis undertaken by the party seeking protection"; (2) "the public must have a strong interest in preserving the free flow of the type of information sought"; and (3) "the information must be of the type whose flow would be curtailed if discovery were allowed." *Dowling,* 971 F.2d at 426 (quoting Note, *The Privilege of Self–Critical Analysis,* 96 Harv.L.Rev.1983, 1086 (1983)). *Accord Gatewood,* 170 F.R.D. at 459; *Sheppard,* 893 F.Supp. at 7; *Reichhold,* 157 F.R.D. at 527; *Etienne v. Mitre Corp.,* 146 F.R.D. 145, 147 (E.D.Va.1993). The *Dowling* court observed that a fourth criterion should be added: "that no document will be accorded a privilege unless it was prepared with the expectation that it would be kept confidential." *Dowling,* 971 F.2d at 426. This court would also stress that the privilege protects only subjective analysis designed to have a positive societal effect. The SCA does not apply to objective factual or statistical information. *See Banks,* 53 F.R.D. at 285 (protecting only "written opinions and conclusions" of research team but requiring defendant "to provide the plaintiffs with any factual or statistical information that was available" at time team conducted its study).

Several of the documents at issue in this case do not meet all of the aforementioned criteria and therefore are not subject to the privilege. Specifically, the court finds that the following documents fall outside the scope of the SCA: Lockheed's affirmative action plans and attachments thereto; yearly and monthly reports concerning utilization goals by branch; job area acceptance range reports; back-up data reports concerning job impact; reconciliation reports; worksheets for determining OFCCP eight-factor analyses; and materials concerning progress toward goals.

First, although the information resulted from a self-analysis performed by Lockheed, the court cannot say that the information itself constitutes subjective analysis designed to have a positive impact on equalizing employment opportunities. Lockheed has repeatedly asserted that the information contained in these documents should be privileged because, in enforcing the regulations that require federal contractors to create affirmative action plans, the OFCCP affords the company certain evaluative discretion. For example, federal regulations require that the affirmative action plan of federal contractors contain job group, availability, and utilization analyses based on a consideration of eight specific factors. *See* 41 C.F.R. § 60–2.11(b). Lockheed argues that, because it can choose how to define its own job groups and how to weigh the eight factors, the process constitutes self-critical analysis. Similarly, Lockheed argues that the OFCCP's practice of allowing contractors to choose among various plans for determining underutilization renders the information produced in many of the reports self-critical. *See* 1 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 1111–12 (3d ed.1996) (discussing choices for determining underutilization). Once these particular choices are made, however, it appears that the information contained in the documents is derived simply by compiling data related to the mandatory factors. By and large, the information contained in these reports is factual, and the discretion afforded to the employer at the beginning of the process does not change the objective nature of the information. In short, "[a]lthough the figures required might be susceptible to some well-based speculation, this, in and of itself, does not appear to be a valid reason for withholding the self-evaluation aspects of [Lockheed's] AAPs." *O'Connor v. Chrysler Corp.,* 86 F.R.D. 211, 215 (D.Mass.1980) (reviewing applicability of SCA to utilization analysis in affirmative action plan). *Cf. Hardy,* 114 F.R.D. at 642 (questioning whether documents referring to minority utilization analyses are evaluative "since it is simply a recording of statistical information").

Second, the court perceives no strong public interest in preserving the free flow of the information contained in the aforementioned documents, nor is this the type of information whose flow would be curtailed if discovery were allowed. As intimated above, all of the documents at issue were produced in compliance with mandatory reporting requirements.[4] As demonstrated, the primary policy rationale for applying the SCA is to encourage employers to candidly evaluate and positively impact equal employment opportunities. In other words, the privilege is designed to avoid a "chilling effect" on employers' voluntary efforts to prevent discrimination in the workplace. With regard to documents such as those at issue here, however, any chilling effect would be de minimis since the documents are mandated by law. See Tharp, 149 F.R.D. at 182; Etienne, 146 F.R.D. at 148. And while the court is sensitive that disclosure might prompt some employers to be less forthright in exercising their discretion under the OFCCP system, it is not convinced either that this result is inevitable or that the OFCCP itself could not remedy that problem.[5]

Furthermore, the fact that this information was mandated by the OFCCP lessens any reasonable expectation that the information would remain confidential. The OFCCP's regulations provide for the general disclosure of "identifiable records obtained or generated pursuant to Executive Order 11246" if such disclosure "furthers the public interest and does not impede any of the functions of the OFCCP." 41 C.F.R. § 60–40.2. The regula-

tions specifically require that affirmative action plans be disclosed upon request, id., although the agency will withhold confidential commercial or financial information, as well as staffing or pay information to the extent it would injure the business position of the contractor. See 41 C.F.R. § 60–40.3(a). With the prior approval of the agency's director, the OFCCP may withhold other records on a case-by-case basis. 41 C.F.R. § 60–40.3(b). Accordingly, although a federal contractor may be able to secure the confidentiality of certain OFCCP documents, the general rule is that records filed with the agency will be de disclosed to the public if requested. Because the aforementioned documents do not meet the criteria for protection under the SCA, the court GRANTS Plaintiffs' motions to compel as to these documents.[6]

■ By contrast, reports produced for Lockheed's Diversity Council relating to the company's work culture are clearly protected under the SCA. These reports resulted from a voluntary self-evaluation of Lockheed's work environment to facilitate the creation of diversity initiatives and improve the company's performance in equalizing employment opportunities, thereby satisfying the first and fifth criteria. Moreover, because the reports were designed for internal use rather than widespread publication, they satisfy the fourth criterion as well. Finally, there exists a strong public interest in preserving the candid and frank assessments contained in the reports as such evaluations would almost certainly be curtailed if discov-

---

4. Lockheed's affirmative action plans and related materials were prepared pursuant to the mandates of Executive Order 11246 and 41 C.F.R. § 60–2.1.

5. For these reasons, the court disagrees with those decisions suggesting that the SCA should apply primarily to documents mandated by law. See, e.g., O'Connor, 86 F.R.D. at 218 (noting interest "in confidentiality ... to assure fairness to persons who have been required by law to engage in self-evaluation"); Webb, 81 F.R.D. at 434 (stating that "materials protected have generally been those prepared for mandatory governmental reports" because "in view of the fact that the filing of such reports is mandatory, the policy favoring equal opportunity in employment requires that employer be encouraged to be candid and complete in preparing such reports").

Lockheed, however, argues that this court's previous ruling in Woods applied the SCA to mandatory affirmative action plans. While the Woods decision clearly protected from discovery the self-critical portions of the employer's affirmative action plans, the court has found nothing in that decision stating that the plans were created pursuant to government mandate. As such, Woods does not necessarily counsel a conclusion different from that reached in this case.

6. Additionally, Plaintiffs are entitled to any withheld publications of the United States Department of Education. These documents were produced for publication by the federal government and contain objective statistical information. As such, they do not meet any of the criteria for applying the SCA and are not subject to the privilege.

ery were allowed. Indeed, the reports at issue here appear extremely similar to the internal research reports protected in *Banks* and represent the classic example of the type of information privileged by the SCA in the employment discrimination context. Accordingly, Plaintiffs' motions are DENIED as to these documents.[7]

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' motions to compel [63–1; 83–1]are GRANTED in part and DENIED in part. The motions are DENIED as to Lockheed's internal reports concerning work culture and the control and compare reports from Lockheed's databases. The motions are GRANTED in all other respects.

---

7. Plaintiffs' motions are also denied with regard to the withheld control and compare reports from Lockheed's databases. While these documents are not privileged under the SCA, the court finds that they are neither admissible nor likely to lead to admissible evidence. Should Plaintiffs disagree with the court's ruling in this regard, they may file another motion to compel showing why the documents are discoverable.