**Leonard JOHNSON, Plaintiff,**

v.

**UNITED PARCEL SERVICE, INC., a foreign corporation, Defendant.**

No. 5:01–CV–50–0C–10GRJ.

United States District Court,
M.D. Florida,
Ocala Division.

May 8, 2002.

---

Daniel Anthony Amat, Sims, McCarty, Amat & Stakenborg, P.A., Ocala, FL, for plaintiff.

Cynthia J. Brennan, Holland & Knight, LLP, Theodore W. Small, Jr., Holland & Knight—Maguire, Voorhis & Wells, LLP, Orlando, FL, for defendant.

## ORDER

JONES, United States Magistrate Judge.

Pending before the Court is Plaintiff's Motion To Compel (Doc. 18), which previously was denied in part, granted in part, and kept pending pursuant to an Order entered by the Court on February 19, 2002 (Doc. 26). The motion was kept pending because there was insufficient evidence in the record for the Court to decide whether the self-critical analysis privilege applies to two of the disputed discovery items, i.e., Plaintiff's Requests to Produce 22 and 23, which seek management relations and employee relations index surveys for UPS's Central Florida District. Pursuant to the Court's February 19, 2002 Order, the parties deposed UPS's Human Resources Manager for the Central Florida District, and thereafter filed memoranda (Docs. 27 & 28) presenting their opposing views on whether and to what extent the self-critical analysis privilege should apply to the discovery items at issue. For the reasons discussed below, the Court finds that, with respect to the sole remaining issue of the applicability of the self-critical analysis privilege to Plaintiff's Requests to Produce 22 and 23, Plaintiff's Motion To Compel (Doc. 18) is due to be **GRANTED in part** and **DENIED in part,** as described below.

## I. *The Disputed Documents*

Plaintiff's Requests to Produce 22 and 23 seek "[a]ny and all documents which in any way relate to results of management relations index surveys [and employee relations index surveys, respectively,] by UPS in the Central Florida District from January 1, 1996 through the present." (Doc. 18 at 5.)

Based on the deposition of UPS's Human Resources Manager, it appears that the requests to produce implicate three types of documents. First, the surveys, which are taken annually by all UPS employees via computer, produce *computer generated reports* containing percentages of favorable and unfavorable answers to numerous questions regarding topics such as workplace environment, management and co-worker relations, internal communication, customer service, accountability, promotional opportunities, treatment of workers, discrimination, and race relations. (Doc. 27, Ex. A.) Second, *employee comments* at the end of each survey are extracted and printed out. (Doc. 27, Ex. A at 21.) Third, based on the results of the surveys, UPS management creates *action plans* for various work groups.

UPS characterizes the surveys as "voluntary internal self-evaluations [that] solicit subjective assessments of [UPS's workplace]." (Doc. 27 at 5.) UPS states that "[t]he purpose of the surveys is to allow UPS to conduct a critical analysis of its workplace." (Doc. 27 at 5.) Thus, UPS argues that the self-critical analysis privilege applies to the surveys and all results therefrom. (Doc. 27 at 3–8.) Accordingly, UPS asserts that *all* documents resulting from the sur-

veys should be protected from discovery. (Doc. 27 at 8.)

Plaintiff "concedes that the privilege should apply to any action plans created by UPS as a result of information obtained in its employee surveys." (Doc. 28 at 2.) However, Plaintiff argues that "the individual employee comments should not fall under the self-critical analysis privilege ... [b]ecause the employee comments are not documents created by UPS management as part of its self-critical analysis or action plan." (Doc. 28 at 3.) Instead, Plaintiff argues, "those comments are more analogous to statements by co-employees that they too have been treated in a racially disparate manner." (Doc. 28 at 3.) Thus, Plaintiff asserts that, although the action plans are not subject to discovery, the employee comments from the surveys and (presumably) the computer generated reports containing responses to the survey questions should be discoverable.

## II. *Scope of Discovery*

Plaintiff's Motion to Compel seeks discovery throughout UPS's Central Florida District, which includes the Leesburg Center where Plaintiff worked, thirty-four other business centers, and seven cross-functional departments. In its February 19, 2002 Order, the Court ruled that discovery for this lawsuit should be limited to the Leesburg Center because the relevant decisions affecting Plaintiff's employment with UPS were made at the business center level, with very limited district-level involvement. (Doc. 26 at 2–5.) Thus, it should be observed from the outset that, to the extent that the Court

permits discovery with respect to Plaintiff's Requests to Produce 22 and 23, such discovery will be limited to information related to the Leesburg Center.

## III. *The Self–Critical Analysis Privilege*

The Court now turns to a discussion of the self-critical analysis privilege [1] and whether it should be recognized in the context of employment discrimination.[2]

### A. The Origin of the Privilege

The self-critical analysis privilege was first recognized in *Bredice v. Doctors Hospital, Inc.*[3] In *Bredice,* the court held that meeting minutes and committee reports of hospital peer review committees were not subject to discovery in a medical malpractice suit.[4] The court found that the work of such committees is "essential to the continued improvement in the care and treatment of patients."[5] Indeed, said the court, "[c]andid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care."[6] The court reasoned that, "[a]s doctors have a responsibility for life and death decisions, the most up-to-date information and techniques must be available to them."[7] Therefore, the court concluded that "[t]here is an overwhelming public interest in having [peer review committee] meetings held on a confidential basis so that the flow of ideas and advice can continue unimpeded."[8] Accordingly, the court held that the minutes and reports at issue were "entitled to a qualified privilege on the basis of this overwhelming public in-

---

1.  The privilege discussed herein has been given many names by the courts that have dealt with it, including: the self-critical subjective analysis privilege, the peer review privilege, the self-evaluation privilege, the privilege for confidential self-evaluative analysis, and the self-examination privilege. *See* Donald P. Vandegrift, Jr., *The Privilege of Self–Critical Analysis: A Survey of the Law,* 60 Alb.L.Rev. 171, 175 (1996). The name that seems to be the most common, however, is the self-critical analysis privilege, and that name will be used to refer to the privilege throughout this discussion.

2.  It should be noted that Plaintiff does not argue that the self-critical analysis privilege should not be *recognized* by the Court; rather, he contests only its *applicability* to the discovery items at

issue. (Doc. 28.) However, the Court will proceed *sua sponte* to evaluate the threshold issue of whether the privilege should be recognized by this Court as a matter of law.

3.  *Bredice v. Doctors Hosp., Inc.,* 50 F.R.D. 249 (D.D.C.1970), *aff'd,* 479 F.2d 920 (D.C.Cir.1973).

4.  *See id.* at 251.

5.  *Id.* at 250.

6.  *Id.*

7.  *Id.* at 251.

8.  *Id.*

terest." [9]

In the context of employment discrimination, the self-critical analysis privilege was first recognized in *Banks v. Lockheed–Georgia Co.*[10] The plaintiffs in *Banks* sought to compel discovery of an internal report prepared by the defendant's equal employment opportunity team.[11] This report "include[d] a candid self-analysis and evaluation of the Company's actions in the area of equal employment opportunities."[12] The court observed that the report "ha[d] been made in an attempt to affirmatively strengthen the Company's policy of compliance with Title VII and Executive Order 11246."[13] In the court's view, this implicated "an important issue of public policy and ... it would be contrary to that policy to discourage frank self-criticism and evaluation in the development of affirmative action programs of this kind."[14] Citing *Bredice* as an "analogous case," and reasoning that permitting discovery of the report "would not be conducive to compliance with the law," the court concluded that "to allow the plaintiffs access to the written opinions and conclusions of the members of Lockheed's own research team would discourage companies such as Lockheed from making investigations which are calculated to have a positive effect on equalizing employment opportunities."[15] Therefore, the court held that the report was not subject to discovery.[16] However, the court ordered the defendant to produce "any factual or statistical information that was available to the members of Lockheed's research 'team' at the time they conducted their study."[17]

## B. The Weight of Authority

Since the *Banks* decision, many courts have addressed the self-critical analysis privilege in the context of employment discrimination.[18] "A fair number" of district courts have recognized the privilege in this context, while an equal or greater number "have either categorically denied the existence of a 'self-critical analysis' privilege or have rejected its application as to particular documents."[19]

"Very few Circuit Courts of Appeals have directly addressed the self-critical analysis privilege."[20] Of those circuit courts that have addressed the issue, the majority have rejected the privilege.[21] In fact, no circuit

9. *Id.*

10. *Banks v. Lockheed–Georgia Co.*, 53 F.R.D. 283 (N.D.Ga.1971).

11. *See id.* at 284.

12. *Id.*

13. *Id.* at 285.

14. *Id.*

15. *Id.*

16. *See id.*

17. *Id.*

18. *See* Stephen C. Simpson, Note, *The Self-Critical Analysis Privilege in Employment Law*, 21 J.Corp.L. 577, 586 (1996) ("Many courts have considered the arguments in favor of applying the [self-critical analysis] privilege [in the employment discrimination context].").

19. *Tharp v. Sivyer Steel Corp.*, 149 F.R.D. 177, 181 (S.D.Iowa 1993) (citing nine employment discrimination cases in which the court recognized the self-critical analysis privilege, thirteen such cases in which the court rejected the privilege, and three such cases in which the court ordered disclosure subject to a protective order); *see also* Simpson, *supra* note 18, at 586 ("A significant number of ... courts have found [arguments for applying the self-critical analysis privilege] persuasive enough to recognize the self-critical analysis privilege in the employment context. However, an equally significant number of courts have also rejected the privilege in such a context." (citations omitted)).

20. *Abdallah v. Coca–Cola Co.*, No. CIV A1:98CV3679RWS, 2000 WL 33249254, at *5 (N.D.Ga. Jan.25, 2000).

21. *See* Vandegrift, *supra* note 1, at 180–181 (citing cases from the Fourth, Seventh, and Eighth Circuit Courts of Appeals in which the courts rejected the self-critical analysis privilege in the context of employment discrimination; citing cases from the District of Columbia and Ninth Circuit Courts of Appeals in which the courts rejected the privilege in other contexts; and citing one case in which the Sixth Circuit Court of Appeals affirmed, without an opinion, the district court's recognition of the privilege in the context of employment discrimination); *cf. Abdallah*, 2000 WL 33249254, at *5 (citing cases from four circuit courts of appeals in which the courts rejected the privilege in various contexts).

court of appeals has explicitly recognized the self-critical analysis privilege.[22]

"In the context of employment discrimination, the majority of the case law rejects the privilege."[23] Even those courts that have recognized the self-critical analysis privilege in this context have almost always limited the protection to information or documents mandated by statute or regulation, or restricted the privilege's application to purely evaluative material, while ordering the disclosure of non-evaluative facts, statistics, and other data.[24]

In 1990, one influential district court observed that "[f]ederal district courts are moving away from earlier decisions embracing the privilege, and the district courts which have most carefully considered the issue have almost unanimously concluded that the privilege should not be recognized or that it should be recognized only on a very limited basis."[25] That same year, the United States Supreme Court announced a decision that casts considerable doubt on the legitimacy of an evidentiary privilege for self-critical analysis in the context of employment discrimination.

### C. The *University of Pennsylvania* Decision

In *University of Pennsylvania v. EEOC*,[26] a professor filed charges with the Equal Employment Opportunity Commission (EEOC) alleging that her denial of tenure was a product of racial and sexual discrimination.[27] The University refused to provide the EEOC with peer review materials used in making the professor's tenure determination.[28] The district court entered an order enforcing the EEOC's subpoena, and the court of appeals affirmed.[29] On appeal to the Supreme Court, the University urged the Court "to recognize a qualified common-law privilege against disclosure of confidential peer review materials."[30]

The Court framed the issue this way: "The University asks us to invoke [Federal Rule of Evidence 501] to fashion a new privilege that it claims is necessary to protect the integrity of the peer review process, which in turn is central to the proper functioning of many colleges and universities."[31] The Court responded: "We do not create and apply an evidentiary privilege unless it 'promotes sufficiently important interests to outweigh the need for probative evidence....'"[32] "Inasmuch as '[t]estimonial exclusionary rules and privileges contravene the fundamental principle that' the public ... has a right to every man's evidence, any such privilege must 'be strictly construed.'"[33]

The Court stated that although Rule 501 provides courts with flexibility to develop privileges on a case-by-case basis, "we are disinclined to exercise this authority expansively."[34] The Court stressed that it was "especially reluctant to recognize a privilege in an area where it appears that Congress

---

22.   *See Martin v. Potomac Elec. Power Co.*, Nos. 86–0603, 87–1177, 87–2094 and 88–0106, 1990 WL 158787, at *5 (D.D.C. May 25, 1990); Vandegrift, *supra* note 1, at 180–181. *But cf. Reid v. Lockheed Martin Aeronautics Co.*, 199 F.R.D. 379, 385 (N.D.Ga.2001) (citing two cases from the Sixth and Seventh Circuit Courts of Appeals in support of the proposition that "[a] few federal appellate courts ... have suggested that the policy rationales underlying the [self-critical analysis privilege] are valid").

23.   *Abdallah*, 2000 WL 33249254, at *6.

24.   *Id.* at *6; *see also Hardy v. New York News Inc.*, 114 F.R.D. 633, 640–41 (S.D.N.Y.1987).

25.   *Martin*, 1990 WL 158787, at *5 (D.D.C. May 25, 1990) (citation omitted).

26.   *University of Pennsylvania v. EEOC*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990).

27.   *See id.* at 185, 110 S.Ct. at 580.

28.   *See id.* at 186, 110 S.Ct. at 580.

29.   *See id.* at 187, 110 S.Ct. at 581.

30.   *Id.* at 188, 110 S.Ct. at 581.

31.   *Id.* at 189, 110 S.Ct. at 582.

32.   *Id.* (quoting *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980)).

33.   *Id.* (quoting *Trammel*, 445 U.S. at 50, 100 S.Ct. at 912, quoting *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950)).

34.   *Id.*

has considered the relevant competing concerns but has not provided the privilege itself."[35] Noting that Congress had extended Title VII to educational institutions and provided the EEOC with broad subpoena powers, but had not created a privilege for peer review documents, the Court concluded that "we cannot accept the University's invitation to create a new privilege against the disclosure of peer review materials."[36] Thus, the Court affirmed the lower courts and held that the University was not entitled to a qualified privilege against disclosure of confidential peer review materials.[37]

While the Court did not explicitly discuss the self-critical analysis privilege *per se* in *University of Pennsylvania*, it appears that the Court implicitly rejected the privilege in the context of Title VII employment discrimination claims.[38] Still, some courts and commentators have reasoned that, because the Court did not specifically address the self-critical analysis privilege and did not establish broad rules for applying privileges in Title VII cases, *University of Pennsylvania* does not constitute a rejection of the self-critical analysis privilege, and its holding should be limited to its facts, i.e., to the educational institution context.[39]

However, this argument is not consistent with the weight of authority of federal court decisions following *University of Pennsylvania*. In more than a decade since the Court decided *University of Pennsylvania*, it appears that only four district courts have rec-

ognized and applied the self-critical analysis privilege in Title VII cases.[40] Meanwhile, at least a dozen courts have rejected the privilege in such cases subsequent to *University of Pennsylvania*.[41] As one court recently observed, "the majority of the decisions applying the privilege in Title VII cases predate the Supreme Court's decision in *University of Pennsylvania* by several years. The cases rejecting the privilege in the Title VII context, on the other hand, have been decided more recently."[42] Thus, it appears that *University of Pennsylvania* marked a turning point in the recognition of the self-critical analysis privilege in the context of employment discrimination. Such recognition is now a minority position.

### D. The Law in the Eleventh Circuit

The Eleventh Circuit Court of Appeals has not addressed the self-critical analysis privilege in any context.[43] However, two recent decisions from a district court in the Eleventh Circuit have addressed the issue in the context of employment discrimination. Interestingly, while both decisions emanate from the same district court (in fact, the same division of the court), the two decisions reach very different conclusions about whether the self-critical analysis privilege should be recognized.

In *Reid v. Lockheed Martin Aeronautics Co.*,[44] the court recognized the self-critical analysis privilege and applied it in the con-

---

35. *Id.*

36. *Id.*

37. *Id.* at 188, 202, 110 S.Ct. at 581, 589.

38. *See* Simpson, *supra* note 18, at 591 ("[T]he Court implicitly rejected the self-critical analysis privilege because the arguments supporting it are so similar to the arguments the Court rejected [in *University of Pennsylvania*].")

39. *See, e.g., Reid,* 199 F.R.D. at 384; Simpson, *supra* note 36, at 592.

40. *See Abdallah,* 2000 WL 33249254, at *7 n. 4 (noting that as of January 2000, the court "could find only three reported federal court decisions applying the self-critical analysis privilege in a Title VII action after the Supreme Court's hold-

ing in *University of Pennsylvania* "; and further noting that "all three of these cases were decided in New York district courts while another New York district court has recently held that the Supreme Court's decision in *University of Pennsylvania* implicitly rejected the rationale for a self-critical analysis privilege"); *Reid,* 199 F.R.D. at 383–84 (applying the self-critical analysis privilege in a Title VII case in March of 2001).

41. See *Abdallah,* 2000 WL 33249254, at *6.

42. *Id.* at *7 n. 4.

43. See *Reid,* 199 F.R.D. at 384.

44. *Reid v. Lockheed Martin Aeronautics Co.,* 199 F.R.D. 379 (N.D.Ga.2001) (Forrester, J.).

text of a Title VII employment discrimination claim.[45] The court acknowledged that "some courts have concluded that the privilege cannot survive *University of Pennsylvania*, especially in the area of Title VII."[46] But the court noted that "[t]he Eleventh Circuit has not spoken to the issue, and the law therefore remains unclear."[47] Observing that "nothing in *University of Pennsylvania* specifically addressed the [self-critical analysis privilege], nor did that decision establish any categorical rules for applying privileges in Title VII cases," the court reasoned that the *University of Pennsylvania* decision merely "demonstrates that the application of privileges under Rule 501 should be decided on a case-by-case basis."[48]

The *Reid* court went on to recognize four criteria that courts have required before applying the self-critical analysis privilege, and added a fifth criterion of its own.[49] Applying those criteria to the documents at issue in the case, the court concluded that "reports produced for [the defendant's] Diversity Council relating to the company's work culture [were] clearly protected under the [self-critical analysis privilege]," while nine other types of documents were not protected by the privilege, principally because the documents did not constitute subjective analysis (i.e., the information contained in the documents was primarily factual).[50]

In contrast, in *Abdallah v. Coca–Cola Co.*,[51] the court declined to recognize the self-critical analysis privilege in a Title VII employment discrimination case.[52] In a thorough and well-reasoned opinion, the court analyzed the development of the privilege and the impact on it of the Supreme Court's decision in *University of Pennsylvania*.[53] Regarding the scope of the precedent established by *University of Pennsylvania*, the court observed that, "[w]hile [it is true that] peer review documents used in a tenure decision are distinguishable from documents created by a company conducting an internal self-evaluation, ... such materials are nevertheless similar."[54] Furthermore, the court reasoned, "[m]ore important than any similarity is the fact that the Supreme Court was directly addressing provisions of Title VII in stating it was 'especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself.' "[55] Therefore, "[u]pon consideration of the weight of authority" and "the guidance provided by the Supreme Court,"[56] the court concluded that "the self-critical analysis privilege is neither widely recognized nor firmly established and is of doubtful viability in light of the decision in *University of Pennsylvania*."[57] Accordingly, the court held that the self-critical analysis privilege could not be used to protect the

---

**45.** *See id.* at 385. Judge Forrester declared that "[t]he [self-critical analysis privilege] has existed in this district for thirty years, and ... the undersigned has applied it in the employment discrimination context.... Accordingly, the court concludes that the [self-critical analysis privilege] may apply in Title VII cases generally as well as in this case specifically." *Id.*

**46.** *Id.* at 383.

**47.** *Id.* at 384.

**48.** *Id.*

**49.** *See id.* at 386. The five criteria are: (1) the information sought must be the result of a critical self-analysis undertaken by the party seeking protection; (2) there must be a strong public interest in preserving the free flow of the type of information sought; (3) the information sought must be of the type whose flow would be curtailed if discovery were permitted; (4) the information sought must have been prepared with the expectation that it would be kept confidential;

and (5) the information sought must be subjective analysis designed to have a positive societal effect. *See id.*

**50.** *Id.* at 386–87.

**51.** *Abdallah v. Coca–Cola Co.*, No. CIV A1:98CV3679RWS, 2000 WL 33249254 (N.D.Ga. Jan.25, 2000) (Scofield, J.).

**52.** *Id.* at *7.

**53.** *See id.* at *5–7.

**54.** *Id.* at *7.

**55.** *Id.* (citing *Univ. of Pa.*, 493 U.S. at 189, 110 S.Ct. at 582).

**56.** *Id.*

**57.** *Id.* at *8.

documents at issue in the case.[58]

### E. Conclusion

■ As *Reid* and *Abdallah* demonstrate, there is disagreement among judges in the Eleventh Circuit regarding whether the self-critical analysis privilege should be recognized in employment discrimination cases. However, this Court is cognizant of the conclusion reached earlier that recognition of such a privilege is a minority position following *University of Pennsylvania.*

In addition, this Court is concerned that the "important issue of public policy" purportedly implicated by disclosing information in the context of employment discrimination (e.g., *Banks*)[59] does not rise to the level of the "overwhelming public interest" clearly implicated by disclosing self-critical analysis in a medical context (e.g., *Bredice*).[60] Thus, in the employment discrimination context, the rationale for recognizing a judicially created evidentiary privilege is lacking. In fact, many courts and commentators have concluded that the policy objectives underlying employment discrimination laws are more effectively realized through litigation, with unimpeded discovery for plaintiffs, than through a special evidentiary privilege that may or may not actually encourage employers to critically evaluate and improve their employment practices.[61]

Furthermore, this Court is mindful of the Supreme Court's express reluctance to create and apply evidentiary privileges,[62] and its admonition that any such privileges must be strictly construed.[63] This Court shares the view expressed in *Abdallah* that the Supreme Court's reasoning in *University of Pennsylvania* for not recognizing a qualified privilege for self-critical analysis is applicable to all Title VII cases, not just to cases involving educational institutions.[64]

Accordingly, until such time as the United States Supreme Court or the Eleventh Circuit Court of Appeals recognizes the self-critical analysis privilege, this Court is disinclined to recognize the privilege, at least in the context of employment discrimination.

### IV. Decision

Based on the foregoing analysis of the law, the Court concludes that the self-critical analysis privilege should not be recognized in this case. However, even assuming *arguendo* that the self-critical analysis privilege should be recognized as a matter of law in a case such as this, the Court finds that the privilege would not apply to two of the three types of disputed documents in this case.

■ Specifically, the Court finds that the *computer generated reports* and *employee comments* from UPS's management relations and employee relations index surveys would not be protected by the self-critical analysis privilege, if recognized, because such documents essentially constitute anecdotal statements by employees, and do not disclose self-criticism by UPS or the views of UPS management. The Court notes that it previously ruled (in its February 19, 2002 Order) that Plaintiff would be permitted to interview certain current or former UPS employees, subject to certain rules and restrictions. The

---

58. *See id.*

59. *See supra* note 14 and accompanying text.

60. *See supra* notes 5–8 and accompanying text.

61. *See, e.g., Tharp,* 149 F.R.D. at 184 ("Because disclosure of employers' 'self-critical analysis' materials may play a crucial function in civil litigation to eradicate discrimination that exists in the work place, application of the 'self-critical analysis' privilege in employment discrimination cases would impede the progress of that litigation and therefore contravene the public interest served by such litigation."); *Martin,* 1990 WL 158787, at *4 ("To the extent that self-evaluative documents improve private plaintiffs' ability to prove discrimination where it exists, the goal of equal employment opportunity may be significantly better served by discovery than by protection and not—as proponents of the privilege con-

tend—the converse."); Simpson, *supra* note 18, at 596–597 ("The only potentially meritorious argument in favor of the [self-critical analysis] privilege is the 'chilling effect' argument. This argument is not persuasive.... The self-critical analysis privilege should not apply in employment discrimination cases, and private litigants, such as employees, should have access to the evidence which will aid them in eradicating discrimination in the workplace.").

62. *See supra* notes 32 and 34 and accompanying text.

63. *See supra* note 33 and accompanying text.

64. *See supra* note 55 and accompanying text; *see also supra* notes 35–36 and accompanying text.

Court discerns no meaningful difference between employees' responses to interview questions, on the one hand, and employees' responses to survey questions, on the other hand. Regardless of the form of the responses, they are similar in nature. Thus, it is consistent with the Court's previous ruling to require disclosure of UPS employees' responses to the management relations and employee relations index surveys.

With regard to the third type of disputed document, the *action plans* created by UPS management, the Court observes that Plaintiff has conceded that these documents should be privileged. Therefore, the Court will not require production of these documents.

Accordingly, the Court finds that, with respect to the applicability of the self-critical analysis privilege to Plaintiff's Requests to Produce 22' and 23, Plaintiff's Motion To Compel (Doc. 18) is due to be **GRANTED in part** and **DENIED in part**. Defendant shall produce to Plaintiff the computer generated reports and employee comments from the management relations and employee relations index surveys that relate to UPS's Leesburg Center, but shall not be required to produce any action plans created by UPS management from those surveys.

**IT IS SO ORDERED.**